624       65 Mass. App. Ct. 624 (2006)

Commonwealth v. Perry.

## COMMONWEALTH vs. MARCUS PERRY.

No. 04-P-106.

Plymouth. December 8, 2005. - March 2, 2006.

Present: DUFFLY, SMITH, & COHEN, JJ.

*Burglary. Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Habitual Offender. Practice, Criminal,* Assistance of counsel, Request for jury instructions, Instructions to jury, Grand jury proceedings, Indictment. *Grand Jury. Evidence,* Grand jury proceedings.

At the trial of indictments charging the defendant, inter alia, with armed burglary, the judge did not err in failing to instruct the jury to consider whether the defendant's entry into the victim's home was permitted, and the defendant's trial counsel was not ineffective for failing to request such an instruction, where the evidence, viewed in the light most favorable to the defendant, did not support his contention that he did not know that he did not have permission to return to the victim's home. [628-629]

At the trial of indictments charging the defendant, inter alia, with armed assault with intent to murder, the judge was not required, sua sponte, to instruct the jury that they could find the defendant guilty of the lesser included offense of assault with intent to kill, where neither party requested such an instruction and where the evidence, viewed in the light most favorable to the defendant, did not permit a finding of the lesser included offense. [629-631]

The judge at a jury-waived trial properly convicted the defendant of being a habitual offender, where the defendant's prior concurrent prison sentences, imposed for separate and distinct offenses, together with his third conviction of a felony, supported a finding of habitual offender status under G. L. c. 279, § 25. [631-633]

There was no merit to a criminal defendant's claim that his indictment should have been dismissed because false and misleading evidence was presented to the grand jury [633]; likewise, there was no merit to the defendant's claim that his trial counsel was ineffective for failing to raise an estoppel argument, for failing to present a viable defense, for failing to impeach the Commonwealth's witnesses, for failing to object to hearsay, for failing to hire a medical expert, for failing to summons another expert, or for failing to object to portions of the prosecutor's opening statement and closing argument [633-635].

INDICTMENTS found and returned in the Superior Court Department on January 30, 2001.

The cases were tried before *Richard J. Chin*, J.

*David A.F. Lewis* for the defendant.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

Sᴍɪᴛʜ, J. After a jury trial in Superior Court, the defendant was convicted of armed burglary, armed assault with intent to murder, and assault and battery by means of a dangerous weapon.[1] Following the entry of the guilty verdicts, the defendant was arraigned on three indictments alleging that he was a habitual offender, see G. L. c. 279, § 25. After a jury-waived trial, the judge convicted the defendant of being a habitual offender. As prescribed by G. L. c. 279, § 25, the defendant was sentenced to the maximum penalty of life imprisonment for armed burglary, a concurrent twenty-year sentence for armed assault with intent to murder, and a concurrent ten-year sentence for assault and battery by means of a dangerous weapon.

On appeal, the defendant argues that (1) the evidence was insufficient to support the unlawful entry element of armed burglary; (2) counsel was ineffective for failing to request an instruction on the lesser included offense of armed assault with intent to kill, based on either a heat of passion or an intoxication theory; (3) the evidence was insufficient to support the twice "committed" prerequisite to punishment as a habitual offender; (4) the indictments should have been dismissed because false and misleading evidence was presented to the grand jury; and (5) assorted claims raised in his reply brief require a new trial.

The jury could have found the following facts. On September 4, 2000, the victim, Daniel Leger, hosted a Labor Day cookout at his home in Brockton. His guests, consisting primarily of his family and neighborhood friends, began to arrive in the early afternoon. Among the guests were Lisa Matthews and her boyfriend, the defendant, who is the father of Lisa's child. Lisa lived a short distance from the victim's house. About one-half hour after his arrival, the defendant spoke with

---

[1] An indictment alleging armed home invasion was dismissed, as was the corresponding habitual offender charge.

the victim's fourteen year old son, Joshua Leger. As a result of that conversation, Joshua formed the opinion that the defendant was drunk. The defendant, however, was not observed drinking alcohol while at the cookout. The victim drank beer all day and also ingested some cocaine.

When it became dark, the group at the cookout disbanded. A few of the guests stayed behind to help clean up, including Lisa, but not the defendant. After cleaning up, the victim and his guests were relaxing in the living room of the victim's house when a neighbor telephoned. As a result of that call, the victim and his guests went out to the front porch. At that point, the defendant came around from the side of the house to the area near the front porch and began to yell at Lisa that she needed to leave.

When Lisa refused to leave, the defendant grabbed her by the neck as she was standing on the stairs to the front porch and said, "Let's go." When the defendant did not release Lisa, the victim grabbed him and the two began to fight. They wrestled on the porch and then fell over the railing, breaking it, and landed on the ground. The guests on the porch were able to separate the two men. The defendant began to walk away in the direction of Lisa's apartment and, as he did so, told the victim that he was going to come back and kill him.

Everyone went inside the victim's house and the victim locked the door. He went upstairs to retrieve a baseball bat, and Lisa and Joshua followed him. A heated discussion erupted, and within minutes Joshua left and went next door. Joshua failed to lock the door behind him. About five to fifteen minutes after the fight had occurred, Joshua, who was now on a neighbor's front porch, saw the defendant walking towards his father's house. Joshua followed him, keeping his distance. Joshua saw the defendant put his hand on the front door knob, turn it, and enter the victim's home.

Lisa and a neighbor were arguing on the second-floor landing when the defendant entered. The victim, who was also at the top of the stairs, saw the defendant walk through the front door. Within about one second of entering the home, the defendant walked quickly up the stairs towards the victim. The victim told the defendant to leave. A pushing match between the victim and

65 Mass. App. Ct. 624 (2006) 627

Commonwealth v. Perry.

the defendant ensued, and the victim had the defendant against the wall when the defendant raised his right arm and struck him. The victim felt several "whacks in the face and then one down lower." Joshua saw a silver blade in the defendant's hand when he raised his arm and made contact with the victim's face, and then Joshua saw two streaks of blood going down the wall.

The defendant then turned and walked quickly down the stairs. Joshua, who was standing at the bottom of the stairs, ran out of the house ahead of the defendant. Joshua did not notice anything in the defendant's hands when he came out of the house. The defendant walked quickly towards Lisa's apartment. Joshua saw a police cruiser driving down the street and flagged it down. The police officer stopped the vehicle and spoke to Joshua. The police officer then went into the victim's house, took care of the victim's immediate needs, and called for an ambulance.

At the hospital, the victim was treated for three stab wounds to the face and one stab wound to the abdomen.[2] Tests conducted on the victim at the hospital revealed that the victim's blood alcohol content was slightly above the legal limit for operation of a vehicle, and traces of cocaine were detected in his urine. Approximately two weeks after the incident, the defendant was arrested.

The defense presented no witnesses. Through cross-examination and argument, the defendant attempted to establish a defense of misidentification. The theory had some basis in the evidence because Lisa did not testify at trial and the victim could make only an equivocal identification of the defendant. For example, the victim testified, "I don't remember the looks too well, but it's got to be him because, you know." When pressed, the victim said, "Well, the face doesn't really look the same, but I'm sure it was him." Although the victim's son clearly identified the defendant as the perpetrator, defense counsel argued that Joshua did so only to support his father.

---

[2] A second police officer seized a black-handled knife from the kitchen counter of the victim's house because it appeared to have blood on it. The knife was tested for fingerprints, but only a partial fingerprint could be recovered. Because of the very poor quality of the print, the parties entered a stipulation in evidence that indicated that the print had "no evidentiary value."

1. *Unlawful entry.* The defendant argues that the judge failed to instruct the jury to consider whether his entry into the victim's home was permitted, and his trial counsel was ineffective for failing to request such an instruction. The omission was critical, the defendant argues, because an element of armed burglary is unlawful entry, see *Commonwealth* v. *Robbins*, 422 Mass. 305, 313-316 (1996), and an entry is not unlawful if it is permitted. Here, according to the defendant, the evidence shows that he had permission to enter the home during the cookout and that that permission had not been revoked until after he entered the dwelling later that evening and the victim told him, for the first time, to leave.

In support of his argument, the defendant relies on the principles first set forth in *Commonwealth* v. *Robbins, supra.* In *Robbins*, the evidence showed that the defendant had repeatedly been allowed to return to the apartment of his estranged wife, the victim, as recently as two days before she was killed and that he had begun to paint the kitchen while he was there. *Id.* at 313 & n.4. The *Robbins* court ruled that in such circumstances the jury must be informed of the factors that bear on a defendant's right to enter. *Id.* at 315. See *Commonwealth* v. *Fleming*, 46 Mass. App. Ct. 394, 396-397 (1999). These factors have been interpreted to include "whether the entry was permitted, expressly or through cumulative practice; whether the entry was privileged; and whether the defendant knew that he had no right to enter the premises." *Commonwealth* v. *Fleming*, 46 Mass. App. Ct. at 396, citing *Commonwealth* v. *Robbins*, 422 Mass. at 315.

Here, viewing the evidence in the light most favorable to the defendant does not support the defendant's contention that he did not know that he did not have permission to return to the victim's home. First, there was no evidence of any cumulative practice that suggested that the defendant regularly entered the victim's home prior to the day of the cookout. The defendant points to portions of the victim's testimony that, according to the defendant, indicate that the defendant was in and out of the victim's house the day of the cookout.[3] Even if we assume that the victim was describing the defendant being "in and out" of

---

[3] The prosecutor asked the victim if he had seen the defendant at the victim's

the victim's home during the cookout, it does not mean, in view of the defendant's subsequent actions in engaging in a wrestling match with the victim, that he had permission later to enter the victim's home to stab him repeatedly. Common sense dictates that once the defendant threatened to kill the victim, the defendant could not reasonably have believed that he still had permission to enter the victim's home, at least in the absence of some intervening event or permission. Contrary to the defendant's contention on appeal, the facts of this case simply do not present a situation where an invited guest in a home suddenly turns violent. See and contrast *Commonwealth* v. *Fleming*, 46 Mass. App. Ct. at 395-397. There was no error.

2. *Failure to instruct on lesser included offense of assault with intent to kill.* The defendant argues that the trial judge should have instructed the jury, sua sponte, that they could find the defendant guilty of assault with intent to kill, the lesser included offense of assault with intent to murder, on the basis that the defendant acted without malice in the heat of passion, or because he was intoxicated and lacked the specific intent to kill. The defendant also claims that counsel was ineffective for failing to request such an instruction.

The Supreme Judicial Court has "stated repeatedly that, '[w]hen the evidence permits a finding of a lesser included offense, a judge must, *upon request,* instruct the jury on the possibility of conviction of the lesser crime' " (emphasis supplied). *Commonwealth* v. *Woodward*, 427 Mass. 659, 662-663 (1998), quoting from *Commonwealth* v. *Gould*, 413 Mass. 707, 715 (1992). See *Commonwealth* v. *Chase*, 433 Mass. 293, 299 n.4 (2001). The court has not, however, found error when neither the Commonwealth nor the defense requested the instruction. See, e.g., *Commonwealth* v. *Roberts*, 407 Mass. 731, 737 (1990). Here, neither party requested such an instruction. In any event, the evidence at trial, when viewed as required in the light most favorable to the defendant, did not permit a finding of the lesser

house the day of the cookout. The victim replied, "Yeah, he was, he was there, you know, quite a bit of the day." The prosecutor then asked the victim, "You remember what time he arrived, approximately?" The victim replied, "Not really. I think he might have been in and out, but he was there quite a bit of the day."

included offense. See *Commonwealth* v. *Bianchi*, 435 Mass. 316, 328 (2001).

"Assault with intent to kill consists of assault, specific intent to kill, *and* the mitigating factor of heat of passion induced by sudden combat or reasonable provocation. Assault with intent to murder consists of assault, specific intent to kill, and absence of mitigation." *Commonwealth* v. *Nardone*, 406 Mass. 123, 131 (1989). The defendant claims that the prosecutor's closing argument set out facts that show the defendant was acting in the heat of passion, without malice, when he stabbed the victim. The prosecutor argued that "this was a crime of passion" committed "by someone who was angry, someone who was upset." The prosecutor also argued, "[The defendant is] angry. He's upset . . . . [This case is] about his rage and his decision to go seek revenge against . . . the dispute they just had on the front porch." The defendant contends that these remarks, combined with the trial evidence, show that the altercation stemmed from two men fighting over a woman and that the situation was ripe for an "irrational heat of passion to take over and drive events to an unfortunate conclusion."

Neither the evidence nor the prosecutor's closing focused on any dispute between the men over Lisa's affection. Rather, the evidence demonstrated that the victim stopped the defendant from dragging Lisa home by her neck. The wrestling match that ensued simply does not, in view of all the evidence, establish the provocation necessary to negate malice. "[P]hysical contact between a defendant and a victim is not always sufficient to warrant" the instruction the defendant requests. *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). "There must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Id.* at 728. Here, there was no such proof.

Rather, the evidence suggests that after the wrestling match with the victim, the defendant had the mental acuity to walk to

Lisa's apartment, retrieve a knife, walk back to the victim's house, enter it, and attempt to carry out his earlier stated intention to kill the victim. Moreover, the five to fifteen minutes it took the defendant to walk home and return suggests that "sufficient time had elapsed for the [defendant's] temper to cool" and that he was, therefore, no longer under the sway of the earlier event. *Commonwealth* v. *Vatcher*, 438 Mass. 584, 587-588 (2003). See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 838-839 (2004). There was no error.

The defendant also argues that the jury should have been instructed that they could consider his state of intoxication as a factor bearing on whether he had formed the requisite specific intent. See, e.g., *Commonwealth* v. *Johnston*, 63 Mass. App. Ct. 680, 687, *S.C.*, 446 Mass. 555 (2006). The argument fails where there is no evidence that the defendant was intoxicated at the time of the stabbing. Although Joshua testified that the defendant appeared to be intoxicated at about 2:30 P.M., no other witnesses saw him drinking alcohol the rest of the day at the cookout. When Joshua saw the defendant around 10:30 P.M., he described the defendant as walking quickly, with no difficulty, towards the victim's house, and as having no problem opening the door to the house.

3. *Habitual offender conviction.* The defendant claims that he was improperly convicted as a habitual offender because he was committed only once to prison, whereas G. L. c. 279, § 25, requires a habitual offender to have been twice so committed. The pertinent portion of G. L. c. 279, § 25, reads as follows:

> "Whoever has been twice convicted of crime and sentenced and committed to prison in this or another state . . . shall, upon conviction of a felony, be considered an habitual criminal and be punished by imprisonment in the state prison for the maximum term provided by law as a penalty for the felony for which he is then to be sentenced."

Here, the evidence shows, and the defendant does not argue otherwise, that he was previously convicted of four offenses. Two offenses were armed robberies, a third was an armed assault with intent to rob, and the fourth was an unlawful possession of a firearm. Each of the four crimes took place on a dif-

ferent date over a four-month period, each was the subject of a separate indictment, and the three robbery-related charges involved three separate victims. The defendant pleaded guilty to the three robbery-related offenses on June 21, 1993, and received concurrent sentences of six to seven years. On September 9, 1993, he pleaded guilty to the firearm charge and received a sentence of not less than three nor more than five years, to run concurrently with the sentences that had been imposed on the robbery-related convictions. A separate mittimus was issued for each of the four sentences.

On appeal, the defendant argues that his prior convictions do not implicate the habitual offender statute because he served concurrent sentences and thus was not "twice . . . committed to prison," see c. 279, § 25. In support of his argument, the defendant points to the Department of Correction processing forms that show that his imprisonment was viewed as a single commitment and assigned only a single identification number. The argument is misplaced.

Decisional law has specifically held that "[c]oncurrent prison sentences, imposed for separate and distinct offenses, [as here,] together with a third conviction of a felony, support a finding of habitual offender status under the statute." *Commonwealth* v. *Keane*, 41 Mass. App. Ct. 656, 660 (1996).[4] Thus, *Keane* makes clear that the defendant's prior convictions may serve as predicate offenses in support of his conviction as a habitual offender.

More generally, the defendant's argument misinterprets the terms of the statute. Read together, the terms of the statute require that a defendant twice be found guilty (convicted), sentenced to prison (sentenced), and imprisoned for some period of time (committed). See G. L. c. 279, § 25. Requiring a period of commitment eliminates from consideration any prior offenses for which an otherwise qualifying prison term is suspended. Because only a judge can *commit* a defendant to prison, it is the

---

[4]Although the Supreme Judicial Court had left open the question whether two convictions upon which the defendant was concurrently sentenced were sufficient alone, under G. L. c. 279, § 25, as predicate offenses, *Commonwealth* v. *Hall*, 397 Mass. 466, 469 n.4 (1986), it denied the petition for further appellate review in *Keane*. See *Commonwealth* v. *Keane*, 424 Mass. 1102 (1996).

judge's order that controls any determination whether a defendant has been twice committed. See *Commonwealth* v. *Jackson*, 369 Mass. 904, 922 (1976) ("it is the court's function to impose sentences upon conviction"); *Commonwealth* v. *Barriere*, 46 Mass. App. Ct. 286, 289 (1999) (mittimus, as defined in G. L. c. 279, § 34, embodies the sentence imposed by the judge and authorizes "the officer to execute such sentence").

In this case, the separate mittimuses issued in relation to each previous conviction demonstrate that the defendant was separately committed for each sentence. That the Department of Correction, an executive agency, treated the sentences as a single commitment is irrelevant to any determination whether the defendant was twice committed. See *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 753, 756-757 (2005) (that the sheriff's record did not reflect that the defendant was being held pursuant to two separate mittimuses issued by two different counties was not dispositive of his entitlement to jail credit in either county). See also, e.g., *Sheriff of Middlesex County* v. *Commissioner of Correction*, 383 Mass. 631, 635-636 (1981) (execution of sentences is an attribute of executive department).

4. *False and misleading grand jury testimony.* The defendant argues that the grand jury testimony that a knife was found "in the home" was misleading, and that testimony that a police witness did not know the result of the fingerprint analysis was false because the test had been completed, but had produced nothing of any evidentiary value.

That the reference to finding the knife "in the home" may not clearly have referenced the victim's home does not render the testimony false or intentionally misleading. See generally *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986) (false or deceptive testimony must have been knowingly presented and significant in the view of the grand jury to warrant dismissal). Furthermore, despite the defendant's contention to the contrary, the purported "false" testimony from the police witness neither added nor detracted from the actual results. See *ibid.*

5. *Ineffective assistance of counsel.* In addition to the claims the defendant already has made in relation to his trial counsel's performance, he adds the following arguments in his reply brief.

Despite the impropriety of presenting claims for the first time in a reply brief, *Commonwealth* v. *Hampton*, 64 Mass. App. Ct. 27, 33 n.8 (2005), we address them in order to forestall any future claim that appellate counsel was ineffective.

a. *Estoppel.* There is no merit to the claim that the prosecutor was prohibited from presenting evidence or arguing that the defendant was armed when he entered the victim's home merely because the home invasion indictment had been dismissed because such evidence had not been presented to the grand jury. The evidence permitting the inference that the defendant was armed when he entered the house was relevant to the remaining charges, properly admitted, and, therefore, properly argued. See *Commonwealth* v. *Berry*, 63 Mass. App. Ct. 910, 911-912 (2005).

b. *Failure to present a defense.* The defendant argues that trial counsel failed to present any viable defense. Presenting the defense of misidentification was not manifestly unreasonable given the victim's fairly obvious inability to recognize the defendant and the absence of any other percipient witnesses except the victim's son. Notably, the defendant offers no details on appeal of any other viable defense. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

c. *Impeachment.* In the circumstances of this case, the defendant's contention that trial counsel should have impeached the victim and his son with prior inconsistent statements "does not amount to ineffective assistance of counsel." See *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). The defendant's two examples involved only minor inconsistencies that, we are sure, would not amount to reversible error.

d. *Failure to object to hearsay.* The defendant maintains that trial counsel should have objected when Joshua testified that after the assault, he went to his neighbors' house and they called the police department. The evidence added little to Joshua's testimony that he saw the defendant stab the victim and that he flagged down a police officer for help.

The defendant also argues that counsel should have objected to what the defendant labels as hearsay evidence that neighbors telephoned the victim and told him someone was looking in his windows. Counsel did in fact object several times, and one

objection was sustained "as to any conversation." In any event, the statement, while probably improper, added nothing to the proof of the incident, particularly where the victim testified that in response to the call, he went outside and saw the defendant come around from the side of the house.

e. *Medical expert.* The claim that counsel should have hired a medical expert fails because the defendant only offers the speculative benefits of such evidence. See, e.g., *Commonwealth v. Gonzalez,* 443 Mass. 799, 811 (2005).

f. *Failure to summons the expert who examined the knife.* To the extent the defendant claims that counsel should have summonsed and cross-examined the expert who examined the knife, the claim is without merit because the defendant fails to articulate what material evidence the expert would have provided. See *ibid.* See also note 2, *supra.*

g. *Prosecutor's opening statement and closing argument.* The defendant lists a variety of purported improprieties in the prosecutor's opening statement and closing argument, none of which were objected to at trial. The opening statement and closing argument were within the permissible bounds of advocacy. Even if we were to conclude otherwise, the error, if any, did not rise to the level of creating a substantial risk of a miscarriage of justice. See *Commonwealth v. Kozec,* 399 Mass. 514, 518 n.8 (1987).

*Judgments affirmed.*