## Commonwealth *vs.* Justin K. Gaouette.

No. 04-P-1159.

Bristol. November 16, 2005. - June 28, 2006.

Present: Beck, Kafker, & Cohen, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Assistance of counsel. *Self-Defense. Malice.*

A criminal defendant convicted of murder in the second degree failed to demonstrate ineffective assistance of counsel or a substantial risk of a miscarriage of justice arising out of the failure of trial counsel to request, or the trial judge to give sua sponte, instructions on the mitigating effect of provocation or sudden combat on the element of malice required to support a conviction of murder in the second degree, where the evidence demonstrated that the altercation leading to the murder was not sudden and unexpected, but rather prearranged and prepared for by the defendant, who purposely brought a deadly weapon to the fight for protection. [638-643]

At a murder trial, the judge's instructions to the jury on self-defense and excessive force did not give rise to a substantial risk of a miscarriage of justice. [643-645]

INDICTMENTS found and returned in the Superior Court Department on January 24, 2003.

The cases were tried before *Richard J. Chin*, J.

*Joseph S. Berman* for the defendant.

*Sharon L. Sullivan-Puccini*, Assistant District Attorney, for the Commonwealth.

KAFKER, J. Determined to fight over a twenty-dollar debt, the defendant, Justin K. Gaouette, demanded a showdown. At the arranged confrontation, the defendant shot two brothers, killing one of them. After trial on an indictment for murder in the first degree by deliberate premeditation, a jury found the defendant guilty of the lesser included offense of murder in the second degree of David Silva (David). The same jury returned guilty verdicts on five other indictments charging armed assault with

intent to murder Matthew Silva (Matthew); assault and battery by means of a dangerous weapon; unlawful possession of a firearm; unlawful possession of ammunition; and receiving stolen property (a firearm).

On appeal, the defendant argues that (1) the judge erred in failing to instruct the jury sua sponte on a possible verdict of voluntary manslaughter based on the mitigating factors of sudden transport of passion or heat of blood upon reasonable provocation or sudden combat; (2) the judge failed adequately to explain excessive force in self-defense; and (3) trial counsel was ineffective for failing to present a defense based on sudden transport of passion or heat of blood upon reasonable provocation or sudden combat and for failing to request instructions on these mitigating circumstances.

The facts relevant to any instruction on the mitigating circumstances of reasonable provocation and sudden combat are essentially undisputed, but where there is any question, they have been presented below in the light most favorable to the defendant.[1] *Commonwealth* v. *Acevedo*, 446 Mass. 435, 443 (2006).

In the fall of 2002, the defendant and Matthew often spent time together because their respective girl friends, Letitia Boissoneault (Letitia) and Danielle Travers (Dee), were best friends. Sometime in November, 2002, the defendant gave Matthew twenty dollars to install a stereo in the defendant's car. Soon afterward, the defendant had a car accident, no longer wanted the stereo, and instead wanted his money back.

Over the course of the next month, the defendant saw less of Matthew, but relayed messages to him through their respective girl friends that he wanted his money returned. Dee told Matthew that the defendant was getting angry about Matthew's failure to pay back the cash. During this same time period, between Thanksgiving and Christmas, 2002, the defendant acquired a handgun. The defendant stated that the purchase of the handgun had nothing to do with his dispute with Matthew.

The hostilities between the defendant and Matthew escalated

---

[1]The defendant did not testify, but his interview with the police the evening of his arrest had been videotaped and was played for the jury.

on New Year's Eve. That afternoon, Matthew drove Dee to Letitia's house to pick her up so that the two young women could go shopping. As Matthew and Dee stopped at Letitia's house and waited for her to come outside, the defendant drove up behind them with Letitia and two other individuals in his car.

The defendant asked Matthew if he had his money. Matthew said, "No," and told the defendant that he could give it to him next week, when he got paid. The defendant got angry and began yelling at Matthew, "Are you trying to play me?" The defendant took off his coat and handed it to one of his friends who had been in the car with him. The defendant wanted to fight: he yelled at Matthew, "If you get out [of] this car right now, I'm going to bang you"; and "I'll fucking crack you right here." As the defendant drove away from the scene, Matthew was smiling and laughing and told the defendant, "I know where you live, and I got bigger boys than you."[2]

The defendant admitted to police that when he realized Matthew was not going to repay him, "I knew that I wanted to hit him, at least." The defendant said he knew fighting was not going to get his money back, but explained that "I felt disrespected, so I challenged [Matthew] to fight me."

On New Year's Day, at about 5:00 P.M., Letitia arrived at Dee's house to have birthday cake. Almost immediately, the two friends began to argue. Dee told Letitia that the defendant "shouldn't have did [sic] that," referring to the defendant's challenge to fight. Letitia told Dee that Matthew should pay back the money. Letitia got angry and left. She called the defendant to pick her up, and when he arrived, she told him what Dee had said. The defendant, who viewed the statement that he "shouldn't have did [sic] that" as a threat, became very angry and called Dee. When Dee answered, the defendant began to argue with her and said, "[Y]our faggot boyfriend's going to get it."

In short order, Matthew learned through a series of telephone calls from Dee that the defendant was angry and still wanted to fight, so he called the defendant. Upon receiving the call, the defendant began to scream at Matthew, "Where are you? I got

[2]The defendant was five feet, eight inches tall and weighed about 150 pounds.

something for you." Matthew testified that his brother, Nicholas Silva (Nick), overheard the conversation and said into the telephone, "He's at my house. You know where I live. Come get him. You know, if you want to fight him, come down here and fight him." The defendant's account of the telephone call was similar. Dee testified that during the exchange of telephone calls, she received a call from Letitia in which she could hear the defendant saying into the phone, to Dee, "You're in it too"; "I'm going to slap you"; and "you're dead too."

The defendant and Letitia headed towards Nick's house on Cove Street, but stopped first at the defendant's house. The defendant retrieved the .38 caliber revolver that he had recently purchased and loaded it with six bullets. According to the defendant, he did not think the brothers "would have weapons," but he thought that "it was a possibility," and brought the gun for "protection." He stated that "my intentions were not to use it."

Meanwhile, Matthew, Nick, and a third brother, David, gathered at a restaurant that was next door to Nick's house to "have a beer" while they waited. There, they were joined by three friends.

About thirty to forty-five minutes later, the defendant and Letitia arrived on Cove Street. The defendant put the car in park at a slant in front of Nick's house, thinking he was "going to move my car out and park it." There was a group of young men standing outside that included Nick, David, and the three friends; Matthew had gone into the house just before the defendant arrived. Nick, who was near the stairs to his home, began to approach the defendant's car on the passenger side. Nick came within about three or four feet of the vehicle on the passenger side.

According to the defendant's statement to the police, Nick said, "[W]hy don't you put down whatever you had in your hand."[3] The defendant told the police that he was in the process of taking the gun out of his pocket and putting it under the seat,

---

[3]Although we review the testimony in the light most favorable to the defendant, we note that Nick testified that he did not approach the car, but rather stood on the nearby sidewalk and told the defendant to get out of there. He also testified that the defendant was "laughing, and he pulled a gun at me,

in preparation for a fist fight,[4] when Nick walked toward the vehicle. The defendant stated that he "was nervous. . . . So I kind of had my hand on [the gun]." At about the same moment, the defendant realized that Matthew was coming quickly down the steps from the house carrying a baseball bat. Then the defendant said, "That's when I, like, grabbed it."

The defendant further said, "[A]fter that it was like a blur, . . . . [The n]ext thing I remember is Matt walking to the front of the car . . . and then he smashed my window [with a baseball bat]. And that's when I grabbed my gun. . . . I think I shot, like three times." In addition to seeing Matthew with the bat, the defendant remembered a "hand . . . coming [through the driver's side window] trying to . . . pull me." He stated that he shot in the direction of both Matthew and the person trying to reach into the car. He described himself as "just reacting." He said that after he fired one shot they were "still, like, coming after me. So I was still scared, so I fired two more shots." He also remembered hearing banging on the car and commotion from those standing there.[5]

Matthew's testimony was similar. He stated that he ran or walked quickly to where the defendant was parked and went around the front of the vehicle toward the defendant as he held the bat up in the air. Matthew testified that as he "ran around the front, [the defendant] was in the driver's seat, and he pulled something up like this out of the side of the seat, and all I seen was the black and, like, the barrel."

Matthew testified that "as soon as I seen that, I took the baseball bat . . . and smashed the window, the driver's side window." Both the defendant and Letitia were cut by the small shards of glass that flew toward them when the window was smashed. Matthew said that, "As soon as I smashed the window,

---

and he put it back in his seat and then pulled it back up." The defendant denied pointing the gun at Nick.

[4]He stated, "I'm not going to go fight somebody with a freaking gun in my pocket. So I took it out and put it under the seat."

[5]An examination of the defendant's vehicle by the Commonwealth's accident reconstruction expert showed that there was a dent in the left rear quarter panel that was likely caused by having been kicked, particularly given the footprint left on the fender.

that's when I heard the first shot go off. That went out the windshield." Matthew "was struck in the elbow."

After the smashing of the window, Matthew's brother David had come around the rear of the motor vehicle on the driver's side and was reaching into the vehicle in an effort to grab the gun away from the defendant. During the struggle, Matthew heard a second shot and then immediately heard David say, "I'm hit," and saw him jump back from the vehicle. David collapsed on the sidewalk and was pronounced dead at the hospital.

After firing the gun, the defendant drove away. He described himself as "still . . . in shock" when the police pulled them over. He gave a statement to the police that evening.

Letitia was the sole witness testifying for the defense at trial. Letitia testified that the defendant had become increasingly angry over Matthew's failure to repay the money during the month preceding the shootings. Letitia added that when they stopped at the defendant's house, on their way to Nick's house, the defendant changed his clothes. The defendant had been wearing new clothes to meet Letitia's family, but changed into sweat clothes so that he would not get his new clothes dirty during a fight.

The prosecution claimed the murder had been deliberately premeditated. The defense was self-defense. Although at one point in his closing, defense counsel stated, "passions were heated up, and during this heat of passion from both sides, an unfortunate consequence took place," there was no request for a provocation or sudden combat instruction. The judge instructed on murder in the first degree, murder in the second degree, and felony-murder. He also instructed on self-defense as a complete defense and the use of excessive force in self-defense that would reduce murder to voluntary manslaughter.

1. *Voluntary manslaughter on the basis of provocation or sudden combat.* On appeal, the defendant claims ineffective assistance of counsel and a substantial risk of a miscarriage of justice arising out of the failure of counsel to request, or the trial judge to give sua sponte, instructions on the mitigating effect of sudden transport of passion or heat of blood upon reasonable provocation or sudden combat on the element of malice required to support a conviction of murder in the second degree.

The Supreme Judicial Court has "stated repeatedly that, 'when the evidence permits a finding of a lesser included offense, a judge *must, upon request,* instruct the jury on the possibility of conviction of the lesser crime' " (emphasis added). *Commonwealth* v. *Woodward,* 427 Mass. 659, 662-663 (1998), quoting from *Commonwealth* v. *Gould,* 413 Mass. 707, 715 (1992). *Commonwealth* v. *Chase,* 433 Mass. 293, 299 n.4 (2001). Here, neither the defendant nor the Commonwealth requested such an instruction. See *Commonwealth* v. *Berry,* 431 Mass. 326, 338 n.15 (2000); *Commonwealth* v. *Keohane,* 444 Mass. 563, 566-567 (2005). In the absence of a request, "the judge was not required to instruct on reasonable provocation sua sponte." *Commonwealth* v. *Acevedo,* 446 Mass. at 442 n.12.

To address both the defendant's substantial risk of a miscarriage of justice and ineffective assistance of counsel arguments in the instant case, we nonetheless must consider, as a threshold matter, whether the defendant would have been entitled to a reasonable provocation or sudden combat instruction if it had been requested. *Id.* at 442. In undertaking this threshold inquiry, we view the evidence in the light most favorable to the defendant. *Id.* at 443.

Voluntary manslaughter is "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Walden,* 380 Mass. 724, 727 (1980), quoting from *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). More than merely insulting words and the roiling of the emotions from quarreling is required. *Commonwealth* v. *Callahan,* 401 Mass. 627, 632 (1988). Not all physical confrontations, even those initiated by the victim, are sufficient. See, e.g., *Commonwealth* v. *Walden,* 380 Mass. at 727; *Commonwealth* v. *Parker,* 402 Mass. 333, 344-345 (1988); *Commonwealth* v. *Curtis,* 417 Mass. 619, 629 n.6 (1994); *Commonwealth* v. *Vinton,* 432 Mass. 180 (2000). Rather, "[t]here must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would *eclipse his capacity for reflection or restraint,* and that what happened actually did produce such a state of mind in the defendant"

(emphasis added). *Commonwealth* v. *Walden*, 380 Mass. at 728. See *Commonwealth* v. *Acevedo*, 446 Mass. at 443. Such evidence has been provided by sudden, unplanned violent physical confrontations resulting in a loss of control and a deadly reaction. See, e.g., *Commonwealth* v. *Berry*, 431 Mass. at 335 (adequate evidence of provocation where the victim charged the defendant, swung at him, and hit him with a beer bottle); *Commonwealth* v. *Acevedo*, 446 Mass. at 443-444 (adequate evidence of reasonable provocation when the defendant testified that he had been surrounded by the victim and his friends, repeatedly punched in the head, and knocked to the ground, leading him to fear for his life).

In the instant case, the defendant argues that when the brothers quickly converged on the car, Matthew slammed the bat into the driver side window, and David reached into the window, their actions would have produced in an ordinary person a state of anger, fear, fright or nervous excitement as would eclipse his capacity for reflection or restraint. The defendant also described his own state of mind as "scared." He described the events happening "like a blur." He described himself as "just reacting." And when it was over he was in "shock."

Despite the speed and violence of the attack and the defendant's fear and reaction, there are other aspects of this case that weigh heavily against the defendant's entitlement to a provocation or sudden combat instruction, had it been requested here. Although we view the evidence in the light most favorable to the defendant, we do not confine our analysis of the confrontation to the time frame beginning with the defendant's arrival at the house on Cove Street. The shootings must be viewed in the context of all the defendant's statements and actions.

The difficulties with the defendant's argument are illuminated by contrasting the facts of his fight with Chief Justice Lemuel Shaw's classic conception of sudden combat and heat of blood in *Commonwealth* v. *Webster*, 5 Cush. 295, 308 (1850): "When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat. And if no unfair advantage is taken in the outset,

and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ." See *Commonwealth* v. *Lapage*, 435 Mass. 480, 486 (2001) ("whole episode stemmed from a volatile, unexpected confrontation").

Here, in contrast, the defendant came to Cove Street intending to fight to settle a grudge. After unsuccessfully trying to engage Matthew in a fistfight twenty-four hours earlier, he accepted a challenge to fight him at a specific location. He also considered and planned for the possibility of deadly combat. Before driving to Cove Street he returned home to retrieve a revolver that he had recently purchased. He also loaded the gun with six bullets. The defendant explained to the police officers that he brought the loaded gun for "protection" and to deal with the "possibility" that Matthew and his friends might have weapons. See *Commonwealth* v. *Bianchi*, 435 Mass. 316, 325 (2001) ("overwhelming" evidence of planning that included defendant purchasing a gun). Finally, at various points in the twenty-four hours preceding the fight, including the time during which he drove to Cove Street, the defendant had the time to cool off.[6] We are therefore presented with the question whether a defendant who shows up at a predetermined location for the specific purpose of fighting, and arms himself with a gun for the occasion, is entitled to a provocation or sudden combat instruction when that fight escalates into even more violence and he uses the gun to shoot and kill his victim.

We conclude that the defendant was not so entitled. The fight was not sudden and unexpected, but rather prearranged and prepared for by the defendant. The deadly weapon was not carried incidentally, but was brought purposely to the fight for protection. Contrast *Commonwealth* v. *Acevedo*, 446 Mass. at 438 n.5 (defendant testified that he had a knife in his pocket all evening; he carried it for "protection" because he had been "jumped" before). Moreover, street fights are violent, unruly

---

[6]See *Commonwealth* v. *Andrade*, 422 Mass. 236, 238 (1996) (seven hours described as "relatively long cooling-off period"); *Commonwealth* v. *Masello*, 428 Mass. 446, 450 (1998) (several hours "more than sufficient" time to cool off"); *Commonwealth* v. *Keohane*, 444 Mass. at 567 (three and one-half hours sufficient cooling-off time); *Commonwealth* v. *Perry*, 65 Mass. App. Ct. 624, 630 (2006) (five to fifteen minutes sufficient time to cool off).

clashes where weapons are often used. As his statement demonstrates, the defendant understood that and planned for such an eventuality in this case. Although the defendant may have been "scared" by the speed and violence of the assault, he came to fight, considered an escalation of the violence possible, and armed himself for it in advance by bringing a loaded gun. He then fired that loaded gun multiple times, injuring one brother and killing the other when, as was not unexpected (even by the defendant), Matthew was joined by others in the confrontation and a weapon (the bat) was used. No sudden transport of passion or heat of blood instruction is required in these circumstances.

None of the cases relied on by the defendant to warrant a sudden combat or provocation instruction is analogous. In those cases the combat was unplanned, not a showdown demanded in advance by the defendant. The defendant in those cases was also not a persistent aggressor.[7] In *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998), for example, the defendant had been chased by the victim and hit with a baseball bat several times just twenty minutes before the fatal encounter. The defendant then left in his automobile. When the defendant returned to the scene, he yelled at the victim and took a shotgun from his vehicle. When the victim grabbed his baseball bat again and walked toward the defendant, the defendant fired a shot into the ground. When the victim continued to approach, the defendant walked away. The victim followed and hit the defendant's calf with the bat. At that point the defendant "directed the shotgun behind him and fired the fatal shot." *Id.* at 715.

In the Supreme Judicial Court's most recent decision on provocation, *Commonwealth* v. *Acevedo*, 446 Mass. 435, the defendant likewise did not demand or plan for the confrontation and was not the aggressor. Although there had been an argument earlier in the evening and the defendant and his friends had left and returned to the party where the argument had taken

---

[7]Compare *Commonwealth* v. *Curtis*, 417 Mass. at 629 (no provocation instruction required, even though victim tried to hit defendant with a quart bottle, "where it was [the defendant] who confronted the victim and [the defendant] who landed the first blow").

place,[8] the fatal encounter occurred when the defendant was leaving the party a second time and apparently trying to avoid a confrontation. He was then charged by the victim, hit in the face by someone else, and in response he swung a knife that he carried for "protection." *Id.* at 438. See *Commonwealth* v. *Berry*, 431 Mass. at 334-335 (submission of case to jury on theory of voluntary manslaughter based on sudden transport of passion or heat of blood warranted where incident involved hostilities that escalated over the course of several minutes outside of a bar and, according to the defendant, the victim "charged" the defendant and then hit him with a beer bottle before the defendant acted); *Commonwealth* v. *Rodriguez*, 58 Mass. App. Ct. 610, 611, 613-614 (2003) (jury should have been given correct instruction on sudden passion or heat of blood where evidence, viewed in the light most favorable to the defendant, showed that the defendant was "standing apart" from his armed and aggressive friends — who had been looking to engage another group of young men in a fight — when five men ran at the defendant and he closed his eyes, pulled out his knife and swung it, stabbing one of his attackers).

2. *Instructions on self-defense and excessive force.* Next, the defendant argues that the judge failed to define voluntary manslaughter adequately when he explained the relationship between excessive force in self-defense and voluntary manslaughter.[9] The defendant did not object to the instructions on self-defense or the use of excessive force in self-defense. Consequently, our review is limited to whether the instructions created a substantial risk of a miscarriage of justice. Contrary to the defendant's claim, the judge gave the jury the requisite guidance on voluntary manslaughter based on excessive force in

---

[8]According to the defendant, they left the party the first time because the victim was trying to "start trouble," but returned "hoping that more people had arrived." *Commonwealth* v. *Acevedo*, 446 Mass. at 438.

[9]We note that both the Commonwealth and the defendant proceeded on the assumption that the evidence raised a reasonable doubt whether the defendant was acting in self-defense and, therefore, that the defendant was entitled to self-defense instructions. Although we do not necessarily share that assumption, see *Commonwealth* v. *Toon*, 55 Mass. App. Ct. 642 (2002); *Commonwealth* v. *Tirado*, 65 Mass. App. Ct. 571 (2006), we need not resolve this issue, which has not been presented by the parties and is not necessary to decide the case.

self-defense by using the instruction approved by the Supreme Judicial Court. See Massachusetts Superior Court Criminal Practice Jury Instructions, Model Jury Instructions on Homicide § 2.4.2(3) (1999 & Supp. 2003).[10] He also gave the instruction on self-defense that is set forth at Massachusetts Superior Court Criminal Practice Jury Instructions § 3.6.1 (1999 & Supp. 2003), and is similar to the Model Jury Instruction on Homicide § 2.10 (1999 & Supp. 2003). Under the circumstances presented here and in the absence of a specific request, more was not required.

The defendant also argues that the judge's instruction to the jury that malice could be mitigated by "the use of force in self-defense" was confusing and incorrect because it omitted the adjective "excessive." The portion of the judge's charge immediately following this omission made clear that if the jury had a doubt whether the defendant acted in self-defense, they must acquit, and if the Commonwealth proved that the defendant had used excessive force in self-defense, a finding of voluntary manslaughter was warranted. Moreover, the judge's reinstruction to the jury, given in response to a jury question, properly included the earlier omitted adjective, "excessive."

The defendant further claims error in the judge's use of the following phrase in his instruction on excessive force: "If, however, the Commonwealth does prove excessive force in an effort to defend oneself, you would be justified in *finding* the defendant guilty of voluntary manslaughter" (emphasis supplied). The "finding" language is included in the Model Jury Instructions on Homicide § 2.4.2(3). *Commonwealth* v. *Walker*, 443 Mass. 213, 219 (2005). The Supreme Judicial Court has held that this instruction is a correct statement of the law. *Ibid.*[11]

Viewing the instructions as a whole, as we must, *Com-*

---

[10]This instruction is designated to be used "For Murder Cases in Which Voluntary Manslaughter is Also Covered." The instruction that the defendant argues should have been given is Model Jury Instructions on Homicide § 2.6.1, which is entitled "Voluntary Manslaughter (In the Absence of a Murder Charge)."

[11]The defendant also recasts the above argument as a claim for ineffective assistance of counsel. For the reasons already stated, this claim fails as well. See, e.g., *Commonwealth* v. *Curtis*, 417 Mass. at 624 n.4.

*monwealth* v. *Niemic*, 427 Mass. 718, 720 (1998), we are convinced that the judge properly conveyed to the jury that the burden was on the Commonwealth to prove all the elements of the crime and that the defendant was not required to prove anything; that the Commonwealth bore the burden of proof on the absence of self-defense; and that the Commonwealth had the burden to prove excessive force in self-defense beyond a reasonable doubt.

*Judgments affirmed.*