OTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1818                                          Appeals Court

COMMONWEALTH  vs.  ROBERT IACOVIELLO
(and three companion cases[1]).

No. 13-P-1818.

Suffolk.     April 8, 2016. - September 15, 2016.

Present:  Cypher, Katzmann, & Massing, JJ.


Homicide.  Practice, Criminal, Instructions to jury.  Self-
     Defense.  Wanton or Reckless
     Conduct.  Intoxication. Evidence, Prior violent
     conduct.  Accessory and Principal.


Indictments found and returned in the Superior Court
Department on December 20, 2007.

The cases were tried before Patrick F. Brady, J., and a
motion for a new trial, filed on May 6, 2014, was heard by him.


Sara A. Laroche (Patricia L. Garin with her) for Robert
Iacoviello.
Willie J. Davis for James Heang.
Cailin M. Campbell, Assistant District Attorney (Edmond J.
Zabin, Assistant District Attorney, with her) for the
Commonwealth.


---

[1] Two of the companion cases are against Iacoviello and one
is against James Heang.

CYPHER, J.  In the early morning hours of September 29, 2007, two groups converged in the dark near a baseball field behind Revere High School.  One group consisted primarily of off-duty Revere police officers dressed in civilian clothes. The other group consisted of four local young men who were either members of or affiliated with a gang.  Both groups had been drinking for much of the night.  Heated, gang-related words were exchanged.  Guns were fired from both sides.  One person, off-duty Revere police Officer Daniel Talbot, was fatally wounded.  A second person, defendant Robert Iacoviello, was charged with murder in the first degree, carrying a firearm without a license, and possession of a firearm without a firearm identification card.  A third person, defendant James Heang, who had not been present during the fateful encounter, was charged with being an accessory after the fact in aid of Iacoviello and carrying a firearm without a license.

In a joint trial, a jury found Iacoviello guilty of murder in the second degree, G. L. c. 265, § 1, and carrying a firearm without a license, G. L. c. 269, § 10(a).[2]  The jury found Heang not guilty of carrying a firearm without a license, G. L. c. 269, § 10(a), but guilty of being an accessory after the fact, G. L. c. 274, § 4.  The defendants appeal, raising issues

---

[2] Prior to the start of the trial, Iacoviello pleaded guilty to possession of a firearm without a firearm identification card.

they preserved during the proceedings below. Iacoviello primarily argues that the trial judge erred by declining to instruct the jury on self-defense, voluntary manslaughter, and involuntary manslaughter. Heang primarily argues that the trial judge erred by prohibiting him from pursuing a consanguinity defense, which is an exemption to prosecution under the accessory after the fact statute. For the reasons discussed below, we vacate Iacoviello's conviction of murder in the second degree and Heang's conviction of accessory after the fact.[3]

1. Background. We recite the facts in the light most favorable to defendant Iacoviello to determine whether he was entitled to jury instructions on self-defense, voluntary manslaughter, and involuntary manslaughter. See Commonwealth v. Santos, 454 Mass. 770, 773 (2009).

After an afternoon of firearms certification exercises on September 28, 2007, Talbot and two of his fellow officers, William Soto and Evan Franklin, spent the late afternoon and early evening drinking beer. At about 8:30 P.M. to 8:45 P.M., the three off-duty officers went to the bar at Margarita's restaurant, where they met several other Revere police officers,

---

[3] Although Iacoviello's notice of appeal included an appeal from his conviction of the firearm charge under G. L. c. 269, § 10(a), he has not raised any challenge to that conviction in his appeal. In addition, Iacoviello's appeal from an order denying his motion for new trial was consolidated with his underlying appeal, but he has not raised any separate challenge to that order on appeal.

including Stacey Bruzzese.  Three hours later, at around 11:45 P.M., they were joined by Talbot's fiancée, Constance Bethel, and her friend Courtney, both of whom had been eating and drinking since 9:00 P.M. at another establishment.

At approximately 12:30 A.M. or 12:45 A.M., now on Saturday, September 29, 2007, Talbot, Bethel, Soto, Bruzzese, and Franklin left Margarita's and drove to the baseball field behind Revere High School in Soto's pick-up truck.  Soto parked in the school parking lot, directly in front of an opening in the outer fence around the ballfield.  The opening provided access to a path that, in turn, led down the first base side of the field, behind some bleachers and eventually out to American Legion Highway. Talbot, Soto, Franklin, and Bethel each grabbed a couple of beers from the cooler in Soto's truck and, along with Bruzzese, proceeded down the path to the bleachers, where they remained, talking and drinking.  The area was poorly lit and none of the officers was in uniform.  Talbot and Soto, however, were carrying their department-issued firearms, .40 caliber Glock 22 pistols.  At some point while they were at the bleachers, Soto gave his sweatshirt to Bruzzese because she was cold, leaving his holster and firearm openly visible.[4]

---

[4] Franklin testified that he left his firearm in a backpack in the back seat of Soto's truck.  Bruzzese testified that her firearm was at her home in a safe.

Iacoviello belonged to a neighborhood "crew" consisting of defendant James Heang, Dararin Heang (known as Johnny),[5] Thomas Papandrea, and Derek Lodie. They referred to themselves as "Broadway," and although they were not a gang, they were on good terms, and associated, with a gang known as the "Bloods." Johnny, James's older brother, was the only one from Broadway who was also a member of the Bloods.[6] That night, Iacoviello, Johnny, Papandrea, and Lodie were "hanging out" with others and had been drinking at Amanda McNeil's house.

After the Talbot group had been at the bleachers behind the high school for a period of time, they observed a person approaching on foot along the path. The descriptions of what transpired next differed in various respects from witness to witness. It can be determined from the record, however, that a male in a red shirt and hat, later identified as Lodie,[7] came down the path from the direction of Soto's parked truck and traveled behind the bleachers where the Talbot group was

---

[5] Because they share a surname, we will refer to the Heang brothers as James and Johnny to avoid confusion.

[6] The Bloods were rivals of another gang known as the "Crips." The Crips, meanwhile, were associated with a crew known as "Northgate," named after a Revere apartment complex with that name. In early September, 2007, members of Broadway, including Iacoviello, James, and Johnny, had engaged members of Northgate in a brawl in front of Revere High School.

[7] The witnesses often referred to this person as the man in the red shirt or the man in the red hat. We will refer to the man in the red shirt as Lodie.

gathered.  He was on his cellular telephone (cell phone) and had a "limp" or "swagger."  Witnesses differed as to whether Talbot or Lodie spoke first.  In any event, it appears that Talbot said, "Blood killer," and Lodie did not respond but kept walking.  Someone in the Talbot group said out loud that the person walked like a gangster, to which Lodie responded, "Yeah, a gangster, right."

Lodie was communicating with Johnny over a cell phone as he walked by the bleachers.  He told Johnny that there were people in the field behind Revere High School "causing trouble," "running their mouths," and "disrespecting Bloods."  Lodie thought they were a gang, and Johnny suspected it might be the Northgate crew.  A few minutes later, Lodie called again and Johnny could hear people in the background on Lodie's end saying, "Blood killer."  At trial, Johnny testified that Lodie did not ask for help, but he told Lodie to stay where he was and they would pick him up "and start some trouble."  Iacoviello, Papandrea, and Johnny then left McNeil's house in Papandrea's motor vehicle.  On their way to the high school, Johnny and Iacoviello stopped at the Heangs' home, where they retrieved a nine millimeter Luger from a safe in James's room.  At that time, James was asleep in another room.  From the time the three left McNeil's house until they eventually arrived at Revere High School, Johnny was in nearly constant communication with Lodie

over their cell phones through a "direct connect" feature,[8] with Johnny telling Lodie repeatedly to stay put at the field. Johnny testified that he had decided to bring the gun to scare the other people at the high school.[9]

A short time after the Talbot group's first encounter with Lodie, Lodie reappeared at the field behind Revere High School and another confrontation with the Talbot group ensued. Once again, the descriptions of what transpired differed in various respects from witness to witness. It can be determined from the record, however, that Lodie returned, walking behind the bleachers from the direction of American Legion Highway and heading toward the school and Soto's parked truck. As he passed the bleachers, Lodie, who was on his cell phone, raised his hands and said something to Talbot to the effect of, "[Y]ou're going to see what's up now." Talbot responded and engaged in a verbal exchange with Lodie. Lodie was waving his hands and saying, "I represent, motherfucker. I represent. BK." Talbot immediately "got heated" and both he and Soto told Lodie, "Just

---

[8] The direct connect feature, available on certain cell phone models, allows two cell phone users to speak to one another as if using walkie talkies.

[9] Johnny testified that he had fired the Luger prior to September 29, 2007, at night in a field near McNeil's house. When he retrieved the gun from the safe in the early morning hours of September 29, 2007, he was aware that there were three bullets in it, because that was how many remained when he had put it back in the safe after shooting it, and no one else had subsequently handled it.

get out of here.  If you know what's good, just get out of here."  Talbot then started walking toward Lodie.  According to Papandrea, while he, Iacoviello, and Johnny were walking toward Lodie, he overheard Lodie on the other end of a cell phone, using the direct connect feature, say that someone from the other group at the field had "flashed a hammer," meaning that they had showed a gun.  The three ran toward Lodie.  Soto saw three "short kids, . . . wearing hooded sweatshirts" and with bandanas or black masks covering their faces appear from behind Soto's truck and stand in a line with Lodie.  Papandrea saw Iacoviello pull out the Luger.  According to Soto, the three approaching individuals got "pretty close" to Lodie, so that they and Lodie were essentially in a line next to each other, and "[t]hey shot at us . . . I saw a muzzle flash."

Talbot was somewhat ahead and to the left of Soto when the shot rang out.  It was at that point, "pretty simultaneously" with the gunshot, that Soto realized for the first time that Talbot had his firearm out.  As Soto had been following Talbot, he had been more focused on Lodie and could not see what Talbot was doing with his hands.  He did not see at what point Talbot had actually unholstered his weapon.  Talbot was in a "firing stance" when Soto first saw him with his weapon out.  As described by Soto, Talbot had assumed a "side stance" with the gun in his right hand, pointed toward the other group, and his

right foot slightly back at an angle. Soto, too, assumed a firing stance and fired two or three times back at the other group before moving to his right to take cover behind a trash barrel. Once behind the barrel, Soto looked to his left and saw Talbot lying on the ground, not moving. According to Soto, Talbot was unresponsive from the moment he was shot. During the entire encounter with the other group, none of the officers ever identified themselves as police. Johnny heard a shot go off behind his right shoulder. When he heard the shot, he saw a male from the Talbot group, who was facing them, "drop," falling sideways toward the baseball field. Then there was gun fire -- a "couple of" shots -- coming back at them from the Talbot group. As Johnny ducked and turned to run, he saw Iacoviello, with the nine millimeter Luger in his hand, shoot two more times in the air. Johnny, Lodie, Iacoviello, and Papandrea then ran back to Papandrea's vehicle and drove away.

When Soto went to the aid of Talbot, Soto put his own Glock on the ground. He also noticed Talbot's firearm lying on the ground, so he grabbed it and put it down next to his own. Later that day, September 29, 2007, Talbot died. The medical examiner determined the cause of death to be a gunshot to the head with injuries to the skull and brain.

In the immediate hours after the shooting, two .40 caliber discharged cartridges were recovered at the scene. One was

found on the ground near the trash barrel behind which Soto had taken cover.  The other was found in that same trash barrel.  In addition, a hole was observed in the front bumper of Soto's pick-up truck and the front driver's side tire was flat.  It appeared that a bullet had passed through the bumper and into the tire.  After the State police towed the truck to the State police laboratory in Danvers, they discovered a spent lead projectile in the tire.  Upon examination, the State police determined that it was consistent with a .40 caliber bullet, but it was too damaged to allow for any further conclusions.

Johnny and Iacoviello returned to the Heangs' home and put the nine millimeter Luger back in the safe.  Johnny then went to another room, woke James up, and told him, "[W]e just shot somebody."  James, who was only partly awake, told Johnny to leave him alone and went back to sleep.  Later that day, a friend of the group disassembled the gun and disposed of it in various storm drains.

Sergeant Brian Canavan of the State police ballistics unit later examined both police-issued firearms to determine how much ammunition was in them.  Talbot's Glock contained fourteen live bullets in a magazine and one live bullet in the chamber, for a total of fifteen rounds of ammunition.  Soto's Glock contained twelve live bullets in a magazine and one live bullet in the chamber, for a total of thirteen rounds of ammunition.  Canavan

test fired Talbot's and Soto's Glocks and examined the test cartridges against the two .40 caliber cartridges found at the scene. Canavan was of the opinion that the two casings were fired from Soto's Glock, not Talbot's. Ultimately, only one spent bullet was ever recovered at the scene (in addition to the one recovered from Talbot's body).

The police recovered gun pieces from the storm drains, including two Hi-Point firearm parts (a slide and a barrel). Canavan examined them and determined that they came from a nine millimeter Luger. Using the pieces found in the storm drains, as well as extra parts the State police maintained in their own stock, Canavan rebuilt the weapon. Canavan test fired the rebuilt nine millimeter Luger to obtain test-fired projectiles and cartridges. He then examined the test cartridges against the two nine millimeter casings found at the scene and was of the opinion that the latter had been fired using the recovered Hi-Point firearm parts. He also examined the bullet recovered from Talbot's body during the autopsy, but could not determine exactly what gun it had been fired from, although it did have marks reflecting the rifling system unique to Hi-Point firearms.

2. Absence of jury instruction on self-defense. "A defendant is entitled to a self-defense instruction if any view of the evidence would support a reasonable doubt as to whether the prerequisites of self-defense were present." Commonwealth

v. Pike, 428 Mass. 393, 395 (1998). "In determining whether sufficient evidence of self-defense exists, all reasonable inferences should be resolved in favor of the defendant." Ibid. "[W]e do not balance the testimony of the witnesses for each side, nor do we consider the credibility of the evidence." Commonwealth v. Santos, 454 Mass. at 773. "The evidence bearing upon self-defense may be contained in the Commonwealth's case, the defendant's case, or the two in combination." Commonwealth v. Galvin, 56 Mass. Ap. Ct. 698, 699 (2002). See Santos, supra ("The defendant is entitled to an instruction on self-defense with a dangerous weapon if the evidence, from any source, would warrant a finding in his favor on that issue"). "[W]hether the evidence raises a reasonable doubt as to the predicates for self-defense is often a complex determination and . . . a trial judge should 'err on the side of caution in determining that self-defense has been raised sufficiently to warrant an instruction.'" Galvin, supra at 701, quoting from Commonwealth v. Toon, 55 Mass. App. Ct. 642, 644 (2002). Given the circumstances of this case, the jury should have been instructed on self-defense.

When viewed in the light most favorable to Iacoviello, the evidence reveals that a gunfight broke out behind Revere High School in the early morning hours of September 29, 2007, in a dark and somewhat confined space, between individuals in two

groups who were agitated and intoxicated, and that lasted only a matter of seconds. The percipient witnesses had different vantage points and could reasonably be viewed as having certain allegiances and self-interests, including cooperation agreements and the simple desire not to be prosecuted, that might color their testimony. Given all of these circumstances, it is not surprising that the percipient witnesses provided somewhat conflicting accounts of the critical events -- accounts that, in many cases, changed over time.

More specifically, there was evidence that, viewed in the light most favorable to Iacoviello, the Talbot group, and Talbot in particular, precipitated events during the first encounter with Lodie and continued to act aggressively during the subsequent encounter with Lodie, Iacoviello, and the others from the group. At no point during either encounter did any of the members of the Talbot group, who were dressed in civilian clothes and believed by the Iacoviello group to be members of a rival gang or crew, ever announce that they were police officers. A gun was openly visible in Soto's holster. Moments before the shooting broke out, Talbot, who was heated and refused pleas to let matters be, advanced on Lodie and headed in the direction from which Iacoviello, Papandrea, and Johnny appeared.

Still further, there was evidence that, when viewed in the light most favorable to Iacoviello, Talbot not only drew his Glock during the second encounter, he also assumed a "firing stance," aimed at the Iacoviello group, and fired as many as two to three shots.  No one could say exactly when Talbot drew his weapon.[10]  There was evidence, however, that the first shot fired from the Iacoviello group struck Talbot in the head, that the nature of the wound would have immediately rendered Talbot incapable of volitional movement, and that, in fact, he was unresponsive from the moment he was shot.  If that evidence was believed, a reasonable juror could conclude that Talbot not only pulled out his gun, but also assumed a firing stance aiming in the direction of the Iacoviello group, and fired before he himself was shot.  A reasonable juror also could infer from this that Talbot pulled out his Glock and aimed it at the Iacoviello group, and possibly even fired it, before Iacoviello pulled out the nine millimeter Luger.  That is what Papandrea told the police had occurred when he gave a recorded statement two days after the shooting, on October 1, 2007.  Specifically, Papandrea stated that he was behind both Iacoviello and Johnny as they rounded the corner near Soto's truck and approached Lodie and the Talbot group, that at that moment he heard the first gunshot

---

[10] The Commonwealth conceded that Talbot's gun was out at least by the time he was shot.

ring out and it was coming toward his group, and that only then did he see Iacoviello pull a gun from his waistband and fire one shot.[11]

A self-defense instruction need only be given when deadly force was used if the evidence warrants "at least a reasonable doubt that the defendant:  (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case."  Commonwealth v. Harrington, 379 Mass. 446, 450 (1980).  Based on the foregoing facts, among others, there was at least a reasonable doubt as to all three elements.

a.  Iacoviello's actual belief.  Throughout the trial, the judge expressed skepticism that a self-defense instruction was warranted and ultimately deemed it "too speculative."  "A

---

[11] The Commonwealth notes that when asked about this statement at trial, Papandrea testified that it was not the truth.  The Commonwealth contends that the prior statement was not admitted at trial for its truth.  When Papandrea was questioned about this prior inconsistent statement on cross-examination, however, there was no objection lodged, meaning it was admitted in evidence for all purposes.  See Commonwealth v. Keevan, 400 Mass. 557, 562 (1987); Commonwealth v. Jones, 439 Mass. 249, 261-262 (2003).  The jury, therefore, were free to believe the prior statement, the later statement, or neither statement.

defendant's actual belief that he was in imminent danger of death or serious bodily harm from which he could only save himself by using deadly force looks to the defendant's subjective state of mind." Commonwealth v. Toon, 55 Mass. App. Ct. at 650. Such belief may be determined by circumstantial evidence. Id. at 650-651. Here, the aforementioned facts, if believed, establish that when Iacoviello entered the scene near Soto's truck, he found himself facing Talbot, who was in a firing stance and aiming a gun in Iacoviello's direction. Whether Talbot actually fired first or not, however, these circumstantial facts, and the reasonable inferences drawn therefrom, are sufficient to raise at least a reasonable doubt that Iacoviello had a reasonable ground to believe, and actually did believe, that he was in imminent danger of death or serious bodily harm.

b. Duty to retreat. There is also at least a reasonable doubt as to whether Iacoviello availed himself of all proper means to avoid physical combat before resorting to the use of deadly force. Here, there was evidence that Iacoviello entered the dark pathway, where he would have been partially surrounded by Soto's truck and two nearby fences, and, if believed, faced Talbot, who was in a firing stance and who possibly fired off one or more rounds. This was sufficient evidence to put the question before the jury, who would have been in the best

position to determine whether, under the circumstances, Iacoviello had an opportunity to avoid combat before firing a weapon.  See Commonwealth v. Pike, 428 Mass. at 398-399.

c.  Use of reasonable force.  "Ordinarily the question how far a party may properly go in self defense is a question for the jury, not to be judged of very nicely, but with due regard to the infirmity of human impulses and passions."  Commonwealth v. Kendrick, 351 Mass. 203, 211 (1966), quoting from Monize v. Bagaso, 190 Mass. 87, 89 (1906).  Here, if it is believed that Iacoviello found himself faced by Talbot aiming, and possibly firing, a gun in his direction, that is sufficient to put the question of the reasonableness of his response to a jury.

d.  Prejudice.  "Viewing the facts . . . in their totality rather than in an isolated movement-by-movement fashion," Commonwealth v. Barber, 18 Mass. App. Ct. 460, 465 (1984), we conclude that the failure to instruct the jury on self-defense was error.  As the issue was preserved, we review under the prejudicial error standard.  See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994), quoting from Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445 (1983) (error is not prejudicial only if we are "sure that the error did not influence the jury, or had but very slight effect").  The events behind Revere High School on September 29, 2007,

unfolded rapidly, in the dark, late at night, among individuals who were all intoxicated.  The jury rejected the theory of deliberately premeditated murder.  Had they chosen to believe the evidence supporting self-defense, the jury also could have acquitted Iacoviello altogether on the murder charge, and, as a direct result, James on the charge of accessory after the fact. The error was thus prejudicial.

3.  Absence of jury instructions on manslaughter.  "If any view of the evidence in a case would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given."  Commonwealth v. Brooks, 422 Mass. 574, 578 (1996). Once again, in assessing whether manslaughter instructions were warranted, we consider the evidence in the light most favorable to the defendant.  Commonwealth v. Groome, 435 Mass. 201, 220 (2001).  Iacoviello maintains that a voluntary manslaughter instruction was warranted based on theories of excessive use of force in self-defense and reasonable provocation upon sudden combat.  He also maintains that an involuntary manslaughter instruction was warranted on theories of wanton or reckless conduct in the firing of his weapon, claiming that there was minimal evidence that he was intentionally aiming at Talbot's group and that intoxication impaired his mental processes.

a.  Voluntary manslaughter.  Voluntary manslaughter is an unlawful killing "arising not from malice, but 'from . . .

sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense.'" Commonwealth v. Carrion, 407 Mass. 263, 267 (1990), quoting from Commonwealth v. Nardone, 406 Mass. 123, 130-131 (1989).

i. Excessive force in self-defense. As noted in our discussion of self-defense, supra, the extent to which one who is threatened may go in defending himself is ordinarily a "question[] of fact for the jury, to be decided in light of all of the existing circumstances." Commonwealth v. Shaffer, 367 Mass. 508, 512 (1975). Just as we are of the opinion that the jury should have been permitted to determine whether the shooting of Talbot was committed in self-defense and was therefore excusable, we are of the opinion that the jury should have been permitted to determine whether the shooting was committed through the use of excessive force in self-defense so as to mitigate the crime from murder to manslaughter. As with our conclusion regarding the absence of a self-defense instruction, this error was prejudicial.

ii. Reasonable provocation. Reasonable provocation is provocation that "would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." Commonwealth v. Walden, 380 Mass. 724, 728 (1980). Such an instruction is warranted "if there is evidence

of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." Commonwealth v. Andrade, 422 Mass. 236, 237 (1996), quoting from Commonwealth v. Schnopps, 383 Mass. 178, 180 (1981), S.C., 390 Mass. 722 (1984). The defendant's actions must be "both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." Commonwealth v. Groome, 435 Mass. at 220, quoting from Commonwealth v. McLeod, 394 Mass. 727, 738, cert. denied sub nom. Aiello v. Massachusetts, 474 U.S. 919 (1985).

As noted above, it can be inferred from the evidence, viewed in the light most favorable to Iacoviello, that when Iacoviello entered the scene near Soto's truck, he found himself facing Talbot, who was in a firing stance, aiming a gun in Iacoviello's direction, and possibly even firing at him. From an objective standpoint, it is hard to imagine that this would not have produced in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as to override such a person's capacity to reflect and might cause that person to fire back in Talbot's direction.

The law, however, also requires subjective evidence that Iacoviello actually did lose control in a heat of passion, thereby leading him to immediately fire his weapon back at Talbot.  The Supreme Judicial Court has stated that "[t]he theory of self-defense does not 'automatically' incorporate a theory of reasonable provocation; for example, a provocation instruction is not appropriate when a defendant claims to have acted in self-defense but presents no evidence about his emotional state, or when a defendant argues self-defense but denies experiencing strong feelings of passion, anger, fear, fright, or nervous excitement."  Commonwealth v. Acevedo, 446 Mass. 435, 448 (2006).  See Commonwealth v. Glover, 459 Mass. 836, 841-842 (2011) ("Voluntary manslaughter on a theory of reasonable provocation is closely related to voluntary manslaughter on a theory of excessive use of force in self-defense. . . .  But the two theories are also distinct, and evidence may support one but not the other").  Evidence may establish that a defendant acted in self-defense based on a "calculus of survival," not because he was blinded by a heat of passion based on reasonable provocation, and in such cases an instruction on reasonable provocation is not warranted.  See, e.g., Commonwealth v. Vinton, 432 Mass. 180, 189 (2000) (provocation instruction not warranted where defendant's "argument is based on asserting [his] calculus of survival, not

any blindness of heat of passion on reasonable provocation"); Commonwealth v. Colon, 449 Mass. 207, 222, cert. denied, 552 U.S. 1079 (2007) (defendant, who focused his case on self-defense and "testified that he shot the victim because he had been told that the victim was armed and he thought he 'was going for a gun,'" acted based on calculus of survival, not blindness brought on by heat of passion on reasonable provocation).  Here, the evidence, when viewed in the light most favorable to Iacoviello, raises a reasonable doubt as to whether he acted in self-defense based on his calculus of survival.

     b.  Involuntary manslaughter.  "[W]here a defendant is charged with murder, an instruction on involuntary manslaughter is appropriate if any 'reasonable view of the evidence would [permit] the jury to find "wanton [or] reckless" conduct rather than actions from which a "plain and strong likelihood" of death would follow.'"  Commonwealth v. Tavares, 471 Mass. 430, 438 (2015), quoting from Commonwealth v. Braley, 449 Mass. 316, 331 (2007).[12]  If an involuntary manslaughter instruction is required, evidence of intoxication can be considered by the jury

_____

[12] "Wanton or reckless conduct is 'intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.'  Commonwealth v. Welansky, 316 Mass. 383, 399 (1944).  The degree of risk of physical harm for involuntary manslaughter is thus 'a high degree of likelihood' of 'substantial harm,' whereas for third prong malice there must be a 'plain and strong likelihood of death.'"  Commonwealth v. Earle, 458 Mass. 341, 347 (2010).

in connection with whether the defendant knew, or should have known, that his conduct created a high degree of likelihood that substantial harm would result to another. [13]  See Commonwealth v. Flynn, 37 Mass. App. Ct. 550, 555-556 (1995) (evidence of voluntary intoxication is factor whenever Commonwealth bears burden of establishing knowledge of defendant, as in case of involuntary manslaughter on theory of wanton or reckless conduct).

     i.  Wanton or reckless conduct.  "The likelihood of death ensuing when a loaded weapon is aimed at a person or group of people and then intentionally discharged is plain and strong indeed."  Commonwealth v. Alebord, 68 Mass. App. Ct. 1, 7 (2006).  We preface our discussion by noting that there was sufficient evidence from which a jury could reasonably infer that Iacoviello pointed a loaded gun in the direction of the Talbot group.  In viewing the evidence in the light most favorable to Iacoviello and drawing all reasonable inferences in his favor, however, we cannot ignore that there were also other reasonable inferences that could have been drawn.

---

     [13] Even where there is evidence of intoxication, the evidence must warrant an instruction on involuntary manslaughter before an instruction on intoxication is given.  See Commonwealth v. Sires, 413 Mass. 292, 302-303 (1992); Commonwealth v. Ferreira, 417 Mass. 592, 599 (1994).

With the exception of an alleged jail house confession,[14] there was no direct testimony that Iacoviello pointed the nine millimeter Luger at Talbot or the Talbot group. No one from the Talbot group could specifically testify that they witnessed a gun in Iacoviello's hands. Meanwhile, Papandrea testified at trial that he heard two "bangs" and saw a flash coming from slightly behind him to his side, at which point he turned and saw Iacoviello "with the gun in his hand . . . pointing it." He also had previously stated that Iacoviello only drew and fired the gun after being fired on by the Talbot group. Johnny testified that he heard a shot go off behind his right shoulder, at which point he saw a guy from the other group "drop." Then, after shots were fired back, he ducked and turned to run, whereupon he saw Iacoviello shoot the nine millimeter Luger two times in the air. A little more than one and one-half days later, two (not three) spent nine millimeter casings were located at the scene, along with a fresh abrasion overhead on the branch of a tree. Finally, Johnny testified at trial that his group only brought the gun with them to the high school to scare the other group.

---

[14] At trial, the Commonwealth called Randy Furtado, who testified in exchange for a reduction in a plea recommendation, that Iacoviello had confided in him when the two shared a cell at the Dartmouth house of correction for a few days in May, 2008. Furtado testified that Iacoviello admitted that he shot Talbot and demonstrated this to Furtado by holding his hands straight out in front of him.

Where there is evidence that the defendant was not pointing or aiming a gun at the victim, but rather was aiming in the air or at the ground, an involuntary manslaughter instruction based on a theory of wanton or reckless conduct is warranted.  See, e.g., Commonwealth v. Ferrara, 368 Mass. 182, 190 (1975) (inference of involuntary manslaughter was warranted where witness testified that he did not think defendants were aiming rifle at victim); Commonwealth v. Greaves, 27 Mass. App. Ct. 590, 594 (1989) (upholding reduction of jury verdict to manslaughter where judge believed "the evidence that the defendant was a considerable distance away from the building when he shot the rifle and that he was aiming at the roof").

The same has been true where there has been evidence that a defendant engaged in wanton or reckless conduct for the purpose of scaring, not shooting, a victim.  See Commonwealth v. Martinez, 393 Mass. 612, 614 (1985) (instruction on involuntary manslaughter warranted where "the jury could have found that defendant threw a lighted newspaper at one of the victims intending no more than to frighten or upset the victim").  As there was evidence here from which a jury reasonably could have inferred both that Iacoviello brought the gun to the high school for the purpose of scaring what turned out to be the Talbot group and that he did not aim the gun at the Talbot group once he arrived, an involuntary manslaughter

instruction was warranted.  Given the obvious consequences to Iacoviello, the failure to give such an instruction was prejudicial.

ii.  Intoxication.  Having determined that an involuntary manslaughter instruction was warranted, we need not labor long in determining that an accompanying instruction on intoxication was warranted as well.  There was evidence that Iacoviello had been drinking heavily in the hours before the encounter and that he was intoxicated.  In fact, the trial judge instructed the jury that they should consider any credible evidence of the effect on Iacoviello of his consumption of alcohol and drugs in determining whether the Commonwealth met its burden of proof with respect to the issues of intent, knowledge, and deliberate premeditation.  It follows that a similar instruction would be warranted in connection with an involuntary manslaughter instruction.

4.  Adjutant evidence.  Iacoviello contends that the judge abused his discretion when he excluded Iacoviello's proffer of evidence of a prior incident, on October 31, 2006, where Talbot, while on duty, discharged his firearm nine times at James Bombard, whom Talbot and other Revere police officers were attempting to apprehend for allegedly assaulting some individuals at knife point.  Contemporaneous reports from other Revere police officers reflect that Talbot stated at the time

that after identifying himself as a police officer and drawing his firearm, he was forced to shoot because Bombard charged him with a knife.  Iacoviello intended to call two police officers and Bombard as witnesses.  Bombard reportedly would testify that he came around a corner and saw an unidentified individual pointing a gun at him.  Bombard turned and ran, at which point the person shot at him multiple times.  Bombard also would have reportedly testified that he never pulled a knife on that individual and that the individual, who was in civilian clothes, never identified himself as a police officer.  Not one of the nine shots hit Bombard.  The Commonwealth, in turn, indicated that it would need to call numerous witnesses if evidence of the Bombard incident was admitted, including other responding police officers and the individuals Bombard had reportedly assaulted.

"'[W]here the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense,' regardless whether the defendant knew of the victim's prior violent acts."  Commonwealth v. Chambers, 465 Mass. 520, 527 (2013), quoting from Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005).  "[S]uch evidence 'may be admitted as tending to prove that the victim and not the defendant was likely to have

been the "first aggressor"' because it may show 'that the victim acted in conformance with his character for violence.'" Ibid., quoting from Commonwealth v. Adjutant, supra. This type of evidence is referred to as Adjutant evidence.

Here, the judge denied Iacoviello's proffered evidence because (1) the judge believed that the fact that Talbot was acting in his capacity as a police officer during the prior incident with Bombard differentiated it from the type of evidence envisioned as admissible under Adjutant, and (2) the facts of the Bombard incident were disputed, thereby requiring the testimony of numerous witnesses and a trial within a trial. It was also clear, however, that the judge's decision was affected by his ongoing skepticism regarding the predicate issue of the viability of Iacoviello's claim of self-defense. Having concluded that a self-defense instruction was warranted, we leave it for the judge at a new trial to reconsider whether the proffered Adjutant evidence should be admitted.

5. Consanguinity. Because we are vacating Iacoviello's conviction of murder in the second degree, we must, by necessity, also vacate James's conviction of accessory after the fact. See parts 2 and 3, supra. See also note 16, infra. We address James's argument concerning the defense of consanguinity, which is likely to arise in the event of a retrial.

James contends that the trial judge committed prejudicial error by refusing to allow him to assert a defense of consanguinity to the charge of accessory after the fact.  See G. L. c. 274, § 4.  We disagree but conclude that there was a risk of confusion on the part of the jury that should be avoided at any new trial.  General Laws c. 274, § 4, as appearing in St. 1943, c. 488, § 1, provides, in pertinent part:  "Whoever, after the commission of a felony . . . assists the principal felon . . . shall be an accessory after the fact. . . .  The fact that the defendant is the husband or wife, or by consanguinity, affinity or adoption, the parent or grandparent, child or grandchild, brother or sister of the offender, shall be a defense to a prosecution under this section."

As we understand James's argument, he believes that his older brother, Johnny, could have been, like Iacoviello, a "principal felon" in Talbot's death.  Taking the next step, James maintains that because Johnny could have been a principal felon and Johnny is his brother, the statutory defense of consanguinity should have been available to him.  In other words, if the jury found that Johnny could have been a principal felon and that it was Johnny whom James intended to aid in avoiding or escaping detention, arrest, trial, or punishment in connection with Talbot's death, then the statute required the jury to find James not guilty.  James maintains that the jury

would have to find him not guilty under those circumstances even if they found that the aid he rendered also helped Iacoviello.[15] Neither argument is supported by the plain language of G. L. c. 274, § 4, which provides that the principal felon is the person or persons whom the Commonwealth alleges, and ultimately proves beyond a reasonable doubt,[16] committed the underlying felony.  Here, the indictment charging James as an accessory after the fact identified Iacoviello as the principal felon. Contrary to the express language of G. L. c. 274, § 4, James is not related to the principal felon named in the indictment. There is nothing in this language to suggest that simply because another individual, who theoretically could have been charged as a principal felon, is related by consanguinity to the defendant,

---

[15] James requested the following instruction regarding the consanguinity issue:

> "It is absolutely necessary that you find beyond a reasonable doubt that the defendant specifically intended to aid Iacoviello and not his brother Johnny Heang.  This is so because the statute involved also provides an affirmative . . . defense to one who aids a family member. Therefore, if you find that the defendant was rendering aid to his brother, Johnny Heang and this aid also helped the defendant, Iacoviello, you must find the defendant not guilty."

[16] To convict someone as an accessory after the fact, "it [is] necessary to prove beyond a reasonable doubt that . . . the alleged principal . . . was guilty."  Commonwealth v. Borans, 379 Mass. 117, 148 (1979), quoting from Commonwealth v. Reynolds, 338 Mass. 130, 135 (1958).

that the defendant cannot be charged, convicted, or punished for aiding the principal felon identified in the indictment.

As for his second argument, we agree with the judge that it is foreclosed by the decision in Commonwealth v. Doherty, 353 Mass. 197 (1967). Here, the fact that the same acts also might have assisted his brother Johnny does not preclude James's conviction under the indictment charging him with aiding Iacoviello. Id. at 205. The judge did not err in denying James's requests to raise, and instruct the jury on, the statutory defense of consanguinity.

We note that, notwithstanding the unavailability of the statutory defense of consanguinity, nothing prevented James from arguing that he intended to aid his brother Johnny, and not Iacoviello, as a defense to the accessory after the fact charge. His right to raise such a defense, however, would not have been predicated on his consanguinity with Johnny. Rather, it would have been legally predicated on the fact that Johnny was not the principal felon the Commonwealth alleged James was aiding in the specific accessory after the fact charge before the court.

The instruction the trial judge gave the jury here on the accessory after the fact charge focused on whether James intended to, and did, aid Iacoviello:

> "In order to prove the defendant James Heang guilty of this crime, the Commonwealth must prove four elements -- four elements -- beyond a reasonable doubt; first, that Robert

Iacoviello -- Robert Iacoviello -- is guilty of the crime which James Heang is accused of having aided, namely, the murder of Daniel Talbot; second, that the defendant James Heang assisted the perpetrator of the murder of Daniel Talbot, allegedly, Robert Iacoviello, following the commission of the crime; third, that the defendant James Heang provided such assistance with the specific intent -- the specific intent -- that the perpetrator, allegedly, Robert Iacoviello, avoid or escape arrest, detention, or prosecution; fourth, and finally, that the defendant James Heang rendered such assistance with knowledge of the identity of that perpetrator and of the substantial facts of the killing of Daniel Talbot."

This instruction was essentially proper. In a case like the present one, however, where the facts reasonably suggest that a defendant could have intended to aid someone other than the named principal felon, we think that additional instructions on the intent element are warranted. In particular, additional instructions should focus on whether the defendant provided aid to assist the named principal felon or whether the defendant's specific intent was to aid someone other than the named principal felon.

6. <u>Conclusion</u>. On the indictment charging Iacoviello with murder, the judgment is vacated and the verdict is set aside. On the indictment charging James Heang with accessory after the fact, the judgment is vacated and the verdict is set aside. The judgments are otherwise affirmed.[17]

---

[17] To the extent that we have not addressed other points made by the parties, they "have not been overlooked."

So ordered.

---

Department of Rev. v. Ryan R., 62 Mass. App. Ct. 380, 389 (2004), quoting from Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).  We have considered them and found them to be without merit.