# DECISIONS

## OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

COMMONWEALTH *vs.* GLEN S. ALEBORD.

No. 05-P-434.

Plymouth. September 14, 2006. - December 28, 2006.

Present: DOERFER, KAFKER, & MILLS, JJ.

*Homicide. Practice, Criminal,* Instructions to jury. New trial. *Intoxication. Joint Enterprise.*

At the trial of an indictment charging murder in the first degree, the judge properly denied the defendant's request for a jury instruction on involuntary manslaughter, where the defendant shared the intent of his coventurer to fire a rifle into a crowd to cause fear and to secure the return of money, even though the defendant stated afterwards that he did not want the shooter to hit anyone and was surprised that he did. [6-9]

At a murder trial, the giving of jury instructions on intoxication after an explanation of the elements of murder in the first degree did not constitute prejudicial error. [9-10]

A Superior Court judge properly denied a criminal defendant's motion for a new trial based on ineffective assistance of counsel (stemming from counsel's failure to locate and call a certain witness to testify regarding the defendant's motivations), where the jury did not find credible the defendant's testimony as to his actions and motivations, and where the

limited, indirect light that the witness would shed on the defendant's motivations did not raise any substantial issue entitling the defendant to an evidentiary hearing. [10-11]

INDICTMENT found and returned in the Superior Court Department on December 29, 2000.

The case was tried before *Linda E. Giles*, J., and a motion for postconviction relief, filed on September 8, 2005, was heard by her.

*Chauncey B. Wood* for the defendant.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

KAFKER, J. Dissatisfied with a drug transaction, defendant Glen S. Alebord and Timothy L. Braley went looking for the dealer. When Braley shot and killed a man in the venture, Braley and the defendant were both charged with murder in the first degree.[1] A jury convicted the defendant of the lesser included offense of murder in the second degree as a joint venturer.[2] Consolidated before us are the defendant's appeals from his conviction and from the denial of his motion for a new trial. He argues that his request for a jury instruction on involuntary manslaughter was improperly denied; that the jury instructions on intoxication and malice constituted prejudicial error; and that his motion for a new trial based on ineffective assistance of counsel was wrongly denied or that, at a minimum, there should have been an evidentiary hearing on the new trial motion. We affirm.

*Background.* The defendant's trial took place well over a decade after the homicide due to his successful concealment of his role in the crime. The Commonwealth's case included testimony from an eyewitness, James Jones, and two other wit-

---

[1]The defendant filed a motion to sever his case from that of his codefendant, Timothy L. Braley. The motion to sever was granted. Braley was convicted of murder in the first degree. His appeal is currently pending before the Supreme Judicial Court.

[2]The judge instructed on joint venture. See note 9, *infra*. There is no question that the defendant was not the principal as all the evidence confirms that Braley was the shooter. There was also no charge of or instruction on felony murder.

nesses: Lynette Drew and Heidi Eaton, both former girl friends of the defendant and mothers of his children. Eaton was the defendant's girl friend at the time of the homicide. Drew began dating the defendant the following year and remained with him for roughly five years, during which time he would speak of the homicide to her when he had been drinking. The defendant also testified.

The Commonwealth offered the following evidence: On the evening of July 2, 1989, the defendant and his neighbor Timothy Braley, who had been drinking together, drove to Brockton in the defendant's blue pickup truck.[3] In the truck was the defendant's .22 caliber rifle stored in a pouch that hung behind the front seat. They went to the home of a woman they called "Cookie," who lived on Warren Avenue in Brockton, to buy drugs. Cookie paged her dealer but received no response.

Drew testified that the defendant told her that he and Braley left Cookie's apartment together "to go find some [drugs] from somebody on the street." After they were "sold something fake," the defendant and Braley "went out to find the man who sold it to them . . . [b]ecause they were pissed. They wanted revenge on him. They were angry."

Two black men were standing in front of a bakery when the defendant and Braley arrived in the defendant's truck. One was the victim, Benjamin Shiren, who lived across the street from the bakery. The other, James Jones, testified that he and the victim had been chatting when two white men with a tan dog drove up in a blue pickup truck.[4] The passenger in the truck asked Jones and the victim if they had seen "Maurice, or something like that." The victim answered "No." Jones then saw the passenger raise a rifle with a scope through the passenger window. Jones testified that the passenger said, "Well, how do you like this?," and opened fire. Jones took cover behind a nearby car. The victim sustained a fatal gunshot wound to the back.

Drew testified that the defendant told her that he had expected

---

[3]The defendant testified that he brought two of his dogs along in the truck.
[4]The defendant testified that he left one dog with Cookie.

Braley to shoot the man in the leg, rather than the back. She also testified that the defendant told her that he later abandoned his rifle in a swamp, painted his truck black, took Eaton and their baby daughter to Maine, and applied for a United States passport.

Eaton testified to her own recollection of the events of July 2, 1989. The defendant and Braley had been drinking together that evening. The two men left the apartment with the defendant's two dogs at around 11:00 P.M., telling Eaton that they were going to Brockton to party at a friend's house. Several hours later, the men returned to the apartment and woke Eaton. The defendant told her that, on their way to the party in Brockton, they had gotten lost and had stopped to ask a group of black men for directions. One of these men punched the defendant in the face and stole seventy dollars from him. The defendant and Braley retreated to the defendant's truck and drove around the block. The defendant handed his rifle to Braley. "And then they were going to go back and scare them. And then they went back and shot into the group of men."[5]

After telling her this version of the story,[6] Eaton testified, the defendant went into the bedroom, grabbed his shotgun from the closet, and told Eaton "they were going to go back to Brockton and scare them and shoot some windows out of cars or something." The people that he was referring to were those in "the group of men that they had shot at earlier." The defendant and Braley took the shotgun and left in Braley's car. Roughly an hour later, they returned to the apartment, where the defendant told Eaton that "where they had been earlier, . . . the place was loaded with police."

The next day, the defendant's brother alerted Eaton and the defendant to a front-page story about the shooting in the local newspaper. Eaton testified that the defendant took the rifle out of the truck, wrapped it in a blanket, and hid it in a box that

---

[5]On cross-examination, Eaton agreed that the defendant had told her "that he didn't think [Braley] was going to shoot anybody" and that "he was surprised that [Braley] shot anybody."

[6]The defendant subsequently testified that he made up the story about the black men and the theft of the seventy dollars because he did not want Eaton to be angry at him for staying out so late and going to see Cookie, with whom he had previously flirted.

had contained a gas grill. The defendant and his brother disposed of the gun in a cranberry bog. The defendant then fled with Eaton and their infant daughter to Searsport, Maine, where the defendant painted his truck black and put a white cap on it. The defendant and Eaton also applied for United States passports with the intention of relocating to England, where the defendant held dual citizenship. Neither the defendant nor Eaton ever left the country, though, and the two broke up soon thereafter.[7]

The defendant's testimony differed materially from the Commonwealth's evidence in the following respects. He testified that after Braley collected money from both Cookie and the defendant, Braley went out by himself to purchase cocaine on the street. Braley allegedly returned to Cookie's apartment some time later, showing signs of having ingested cocaine. Rather than admit to this, Braley told Cookie and the defendant that he had been "ripped off" by a dealer who had taken the money and sold him "junk." The defendant testified that he thought Braley was lying because Braley appeared "visibly wired." The defendant said he told Cookie he was sorry and would repay her. Once outside of Cookie's presence, the defendant stated that he asked Braley "if he was serious or if he had the coke in his pocket." When Braley was "just adamant on saying that he had gotten ripped off," the defendant "called [Braley's] bluff and [the defendant] asked him" what the dealer looked like. Braley then described a black man in a black track suit with a white stripe up the leg and across the front.

The defendant further testified that he and Braley then drove off in the defendant's truck to find the dealer. They drove up to the men in front of the bakery, and the defendant asked them "if they had seen the black man with the black sweat pants." Before they had a chance to answer, Braley reached down, took the gun out of the pouch, and "start[ed] shooting it with one hand, like a nut, out the window." The defendant testified that he had no idea Braley was going to reach for the gun and that the defendant was "shocked from what he did" after Braley opened fire on the men outside the bakery.

In support of his motion for postconviction relief, the

---

[7]Both Eaton and Drew testified that after the shooting, the defendant became paranoid and began drinking heavily.

defendant introduced an affidavit from Eileen Nolet, a woman who claimed to be "Cookie." In her affidavit, Nolet stated that the defendant and Braley came to her apartment on Warren Avenue in Brockton late on the evening of July 2, 1989. They were interested in purchasing cocaine. Nolet paged her dealer and waited for him to call her back; he did not. Eventually Braley said he wanted to buy cocaine on the street. Nolet and the defendant each gave Braley some money and waited in Nolet's apartment while Braley went out. Braley was gone for at least two hours before he returned to Nolet's apartment, showing signs of recent cocaine use, yet claiming he had been "ripped off." Nolet "was aware that it was easy to buy cocaine on the street within a couple [of] blocks of my house . . . . It should not have taken [Braley] more than two hours to find a cocaine dealer. As a result, I concluded that [he] was probably lying and that he had spent our money on cocaine which he had snorted." She described the defendant as "clearly mad at [Braley]" and stated that he "told me he was going to repay me the money that [Braley] had lost." The defendant and Braley then left Nolet's apartment together. Later that night, the defendant returned to Nolet's apartment and repaid the money to Nolet.

*Discussion.* 1. *Involuntary manslaughter instruction.* At trial the defendant requested an involuntary manslaughter instruction. We must therefore consider whether any "reasonable view of the evidence would have permitted the jury to find 'wanton and reckless' conduct rather than actions from which a 'plain and strong likelihood' of death would follow." *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). "In making this determination, we draw all reasonable inferences from the evidence in favor of the defendant." *Commonwealth* v. *Dyous*, 436 Mass. 719, 731 (2002). However, "[a]n involuntary manslaughter charge is not required when it is obvious that 'the risk of physical harm to the victim creates a "plain and strong likelihood that death would follow." ' " *Commonwealth* v. *Souza*, 428 Mass. 478, 493 (1998), quoting from *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996).

The defendant does not argue that his own testimony concerning the shooting entitled him to this instruction. His testimony was that he was completely surprised that Braley fired the gun.

Had this testimony been credited by the jury, it would have supported only an acquittal, not an involuntary manslaughter instruction. The defendant also does not rely on the testimony of Lynette Drew. He apparently recognizes that her testimony — that he and Braley planned to shoot in the leg the person who sold them the fake drugs — described an action from which a plain and strong likelihood of death would follow. Rather, he contends that he is entitled to an involuntary manslaughter instruction based on the testimony of Heidi Eaton.

According to Eaton, the defendant said that he "pulled out the .22 from behind the seat and handed it to [Braley]." They "were going to go back and scare them. And then they went back and *shot into* the group of men" (emphasis added). Later that evening, the defendant returned to the scene with a shotgun, intending to fire some more shots at the windows of the cars of "the group of men they had shot at earlier."

On cross-examination, after Eaton again confirmed that "they had shot into the crowd,"[8] defense counsel asked, "He told you that he didn't think [Braley] was going to shoot anybody, didn't he?," to which Eaton responded, "Yeah." Defense counsel further stated that the defendant "told you that he was surprised that Tim shot anybody," to which she responded, "Yes."

At trial when the judge asked defense counsel the basis for the involuntary manslaughter instruction, counsel stated only that "it may be willful, wanton or reckless conduct on the part of Braley to fire out of a window of a truck, which is either stopped or moving at a slow speed or stopped, toward a crowd of people or toward one or two people." The trial judge properly rejected this argument. The likelihood of death ensuing when a loaded weapon is aimed at a person or group of people and then intentionally discharged is plain and strong indeed. See, e.g., *Commonwealth* v. *Mack*, 423 Mass. 288, 290 (1996) ("Absent some evidence that the defendant's knowledge was impaired, intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death"; therefore, no involuntary manslaughter instruction required);

---

[8]Eaton later clarified: "He [the defendant] said that Tim [Braley] shot the gun . . . ."

*Commonwealth* v. *Jenks*, 426 Mass. at 586 (firing a pistol into a crowded room creates a plain and strong likelihood of death).

This is not a case where the shooter (the principal) fired up in the air or down at the ground. See *Commonwealth* v. *Kinney*, 361 Mass. 709, 712 (1972) (defendant entitled to involuntary manslaughter instruction when he fired into ceiling). Nor is this a case, like *Commonwealth* v. *Ferrara*, 368 Mass. 182, 190 (1975), where the witness whose testimony formed the basis for the request for an involuntary manslaughter instruction testified that the shooters were not "aiming" at the victim. Rather, this is a case where a gun was fired repeatedly into a crowd. See *Commonwealth* v. *Dyous*, 436 Mass. at 732 (there was no evidence that coventurer shot in the air; no involuntary manslaughter instruction warranted). See also *Commonwealth* v. *Gibson*, 424 Mass. 242, 246 n.3, cert. denied, 521 U.S. 1123 (1997) (defendant not entitled to involuntary manslaughter instruction, although one was given, when he fires a gun at man approaching him with a knife, albeit "without aiming").

On appeal, the defendant recasts and refines his argument for the giving of the instruction in two ways. First, instead of arguing that a shooter who fires toward a crowd is entitled to an involuntary manslaughter instruction, he draws a distinction between firing near a crowd and into a crowd. Second, he focuses, for the first time, on what he contends he anticipated Braley would do rather than what Braley did, suggesting that he may not have shared the shooter's intent.[9] He combines these two points to urge that he was entitled to an involuntary manslaughter instruction because Eaton's testimony, when read in its entirety with all reasonable inferences drawn in his favor,

---

[9]During the course of their deliberations, the jury had a question about the shared intent required for the charges they were considering. Specifically, they inquired: "Question, [i]n the second part, proving the second part of joint venture [that is, "that the defendant had knowledge that another intended to commit the crime and shared the intent himself"], the words 'to commit the crime,' what exactly does that mean? One, to commit the crime of murder? Two, to commit the crime of shooting the gun? Three, to commit the crime in general terms?" In answer to the question, the judge stated that "the phrase 'to commit the crime' exactly means . . . to commit the crime of murder, either in the first degree or, if you so find, murder in the second degree." In so instructing, the judge correctly stated the law. See, e.g., *Commonwealth* v. *Cunningham*, 405 Mass. 646, 659 (1989).

presents a scenario in which his intention was to participate in a joint venture where they would shoot near, not at, the victim.

As explained above, this was not a case where the shooter fired up in the air, at the ground, or away from the victim. Nor is this a case where there is any evidence of a plan to fire in this manner. There is no evidence that the defendant communicated any such intention to Braley. The only intention that can reasonably be discerned from Eaton's testimony is a shared intent to fire "into the crowd."[10] The defendant, according to Eaton, was an active and knowing participant in the plan. He gave Braley the gun, drove him to the scene, and shared Braley's intention to shoot at "them." A plan to fire a rifle into a crowd to scare and to secure the return of money does not entitle a defendant to an involuntary manslaughter instruction, even when the defendant states afterward that he did not want the shooter to hit anyone and is surprised that he did. For the purposes of joint venture, "[t]he requisite mental state may be inferred from the conduct of the defendant and the attendant circumstances." *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 818 (2006).

2. *Further alleged error.* The defendant also argues that the trial judge committed prejudicial error in her jury instructions on intoxication, not because of the language of the intoxication instructions, but because of the order in which she gave them. (The judge gave the intoxication instructions after explaining the elements of first degree murder.) As there was no objection at trial, the defendant must demonstrate that there was an error that created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Burgess*, 434 Mass. 307, 316 (2001). The defendant contends that the judge confused the jury by instructing on intoxication before explaining the second and third

---

[10]Even if we were to construe the shared intent to be to fire rounds of near misses, which we do not, that would not be sufficient to support an involuntary manslaughter instruction. There is a plain and strong likelihood of death from this type of gun use as well. *Commonwealth* v. *Santiago*, 425 Mass. 491, 498 (1997), *S.C.*, 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), a case upon which the defendant relies to support his argument that firing near a victim warrants an involuntary manslaughter instruction, is distinguishable. The defendant in *Santiago* was not aiming at the victim, an innocent bystander. Nor was he aiming to fire near her to scare her. If the shooter was aware of her at all, she was in no way his target.

prongs of malice in second degree murder. "When a judge instructs a jury about the relationship between intoxication and a specific intent crime, all that is required is an 'instruction that the jury may consider . . . the defendant's consumption of [alcohol or drugs or both] in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt.' " *Ibid.*, quoting from *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992). Moreover, the judge closed her jury instructions with a reminder that "you may consider evidence of the defendant's mental impairment or intoxication at the time of the crime in deciding whether the Commonwealth has proved that specific intent beyond a reasonable doubt." There was no error.

3. *Motion for a new trial.* The defendant argues that his trial counsel's failure to locate and then call Nolet as a witness constituted ineffective assistance of counsel justifying a new trial pursuant to Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), or at least an evidentiary hearing pursuant to Mass.R.Crim.P. 30(c)(3), as appearing in 435 Mass. 1502 (2001). We conclude otherwise.

"A new trial may be granted under Mass.R.Crim.P. 30(b), . . . 'if it appears that justice may not have been done.' The judge may decide the motion on the basis of affidavits without further hearing, 'if no substantial issue is raised by the motion or affidavits.' " *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981), quoting from Mass.R.Crim.P. 30(b) and (c)(3). We apply an abuse of discretion standard in reviewing the motion judge's decision. *Ibid.*

In denying the defendant's motion for a new trial, the motion judge, who was also the trial judge, reviewed the evidence supporting the defendant's conviction for second degree murder as a joint venturer. The motion judge emphasized that it was undisputed that the defendant was driving the vehicle, was looking for the person Braley identified as having taken their money, and was present when Braley shot the victim. The defendant himself testified that he intended to repay Cookie. Also, the defendant, according to Eaton's testimony, "had handed Braley the rifle right before the shooting." Drew testified that the defendant told her that he had expected Braley to

shoot the victim in the leg. Eaton additionally described the defendant returning to the scene with a shotgun.

Nolet's affidavit does not contradict any of this. Rather, its utility is only to corroborate the defendant's statement that Braley had taken drugs and was not "ripped off" and that the defendant was angry at Braley when he left her apartment. As evidenced by the affidavit, however, Nolet knew nothing about Braley's and the defendant's conversation after they left her apartment, or what occurred in the truck or at the time of the shooting.

The motion judge, who observed the defendant testify at trial, concluded that "Nolet's affidavit does little, if anything, to advance the defendant's cause that he lacked vengefulness." The motion judge wrote that "there was ample evidence from the defendant's own mouth that . . . he ultimately accepted his friend's story . . . : he admitted that, once outside of Nolet's presence, he sought reassurances from Braley as to his sincerity and a description of the 'rip off dealer;' [and] that the two men went off looking for that person." The "motion judge, who had been the trial judge, 'was entitled to use [her] knowledge and evaluation of the evidence at trial' in deciding the merits of the motion." *Commonwealth* v. *Croken*, 432 Mass. 266, 271 (2000), quoting from *Commonwealth* v. *Carver*, 33 Mass. App. Ct. 378, 381 (1992).

The defendant testified as to his actions and motivations, and the jury did not find him credible. The judge who observed the defendant testify found that the limited, indirect light that Nolet would shed on the defendant's motivations did not raise any substantial issue entitling the defendant to an evidentiary hearing. We discern no abuse of discretion in that analysis.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*