NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12546


COMMONWEALTH  vs.  NATHAN LUGO.



Norfolk.     November 5, 2018. - April 24, 2019.

Present: Gants, C.J., Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Homicide.  Constitutional Law, Sentence, Cruel and unusual
     punishment, Search and seizure, Standing to question
     constitutionality.  Due Process of Law, Sentence.  Cellular
     Telephone.  Search and Seizure, Standing to object,
     Expectation of privacy, Emergency, Exigent circumstances.
     Practice, Criminal, Sentence, Instructions to jury,
     Assistance of counsel, Motion to suppress.




     Indictments found and returned in the Superior Court
Department on December 21, 2011, and August 19, 2014.

     Pretrial motions to suppress evidence were heard by Thomas
A. Connors, J., the cases were tried before him, and a motion
for a new trial and resentencing, filed on May 9, 2017, also was
heard by him.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Katherine C. Essington for the defendant.
     Stephanie Martin Glennon, Assistant District Attorney, for
the Commonwealth.
     The following submitted briefs for amici curiae:

Marsha L. Levick, Karen U. Lindell, & Riya Saha Shah, of Pennsylvania, & Laura Chrismer Edmonds for Juvenile Law Center & others.

Nicholas K. Mitrokostas, Eric T. Romeo, & Jaime A. Santos for Louis D. Brown Peace Institute & others.

Meredith Shih for Boston Bar Association.

Elizabeth Doherty for youth advocacy division of the Committee for Public Counsel Services & others.

John P. Zanini, Assistant District Attorney, for District Attorney for the Berkshire District & others.

CYPHER, J.  In November 2011, the victim, Kyle McManus, was murdered after a plan to rob him of marijuana failed.  A jury convicted the defendant, Nathan Lugo, of murder in the second degree.[1]  The defendant, who was seventeen years old at the time of the murder, was sentenced to the mandatory term of life imprisonment with eligibility for parole after fifteen years.[2] On appeal, the defendant argues that the mandatory sentence is unconstitutional because it does not allow the judge to exercise his or her discretion to impose anything less than a life sentence with the possibility of parole.  The defendant contends that the judge erred in denying his motion to continue his sentence so that he could present evidence related to his juvenile status.  He further argues that (1) the judge erred in

---

[1] The defendant also was convicted of armed robbery, possession of a firearm without a license, possession of ammunition without a firearm identification card, and conspiracy to violate the controlled substance law.

[2] The defendant received concurrent sentences for the other convictions.

denying his request to instruct the jury on accident; (2) his counsel was ineffective for not requesting other jury instructions; and (3) the judge erred in denying the defendant's motion to suppress the warrantless "pinging" of his cellular telephone (cell phone).

In Commonwealth v. Okoro, 471 Mass. 51, 62 (2015), we concluded that the mandatory sentencing scheme as applied to juveniles convicted of second-degree murder was constitutional. We left for another day, however, the question whether juvenile homicide offenders require individualized sentencing. We stated:  "Given the unsettled nature of the law in this area and the indication that it is still evolving, we think it prudent to allow this process to continue before we decide whether to revisit our interpretation of [Miller v. Alabama, 567 U.S. 460 (2012),] and the scope of its holding."  Okoro, supra at 61. Now, nearly four years after our decision in Okoro, the defendant asks us to address that very issue.  For the same reasons stated in Okoro, we continue to leave the individualized sentencing question for another day and reject the defendant's other arguments.[3]

---

[3] We acknowledge the amicus briefs submitted by the Louis D. Brown Peace Institute, Families for Justice as Healing, and the National Council for Incarcerated and Formerly Incarcerated Women and Girls; the Juvenile Law Center, the Center for Law, Brain and Behavior, and the Center on Wrongful Convictions of Youth; the Boston Bar Association; the youth advocacy division

Background.  We summarize the facts that the jury could have found, reserving pertinent facts for the discussion of the defendant's arguments.  In addition, we reserve the facts that the motion judge found for the discussion of the defendant's motion to suppress.

The defendant and three friends, Alison Deshowitz, Devante Thames, and Brian Moulton, developed a plan to rob the victim of marijuana.  Deshowitz, who had dated the victim, contacted him under the guise that she was arranging a drug transaction.  The plan was for the group to meet the victim at a restaurant, bring him to his home to secure the marijuana, and then rob him of the marijuana.  The defendant drove the group in his mother's black sport utility vehicle (SUV) to meet the victim.  On the way to the restaurant, he informed the group that he was armed with a revolver.

The group met the victim at the restaurant and drove him to his house to get the marijuana.  After going inside the victim's house to measure the marijuana, the victim and Thames walked back to the SUV that was idling in the victim's driveway.  The victim leaned into the front passenger's side window of the SUV

of the Committee for Public Counsel Services, the Children's Law Center of Massachusetts, Hon. Gail Garinger, and Robert Kinscherff; and the district attorneys for the Berkshire, Bristol, Cape and the Islands, Eastern, Hampden, Northwestern, Plymouth, Middle, and Suffolk districts.

to collect the money for the marijuana that Thames already was holding.  Moulton displayed the money to be used to complete the drug transaction, and the victim commented that it looked to be less than the agreed-upon purchase price.  Upon hearing the victim's suspicions, the defendant "threw the car in reverse" and backed out of the driveway with the victim still leaning through the window.  A scuffle ensued between the victim and Moulton as the victim attempted to grab the money in Moulton's hand and get out of the moving SUV.  The victim did not have a weapon but was carrying an open beer can or bottle that he had taken from the restaurant.  The victim shouted, "Help," before a loud pop was heard; the SUV sped away, leaving the victim behind.  Thames testified that the defendant extended his hand with the gun across the passenger seat.  Moulton bent down, and the defendant shot the victim in the chest.  The victim was pronounced dead at the hospital shortly thereafter.

Police quickly discovered that the victim was last seen alive with Deshowitz.  After going to Deshowitz's house and learning that she was not home, police spoke to her on her cell phone.  Police then attempted to locate her cell phone by "pinging" it.  Deshowitz's cell phone location, coupled with other information that police gathered, indicated that she was located at the defendant's house.  Police proceeded to the

defendant's house, where they arrested the defendant and the group.

At the defendant's house, police discovered a black SUV in the garage. Police recovered several bags of marijuana in the defendant's bedroom and a .22 caliber revolver, later revealed to be the murder weapon, hidden in a hollowed-out hole under a patio brick.

2. Procedural history. The offenses were committed three months before the defendant's eighteenth birthday. At the conclusion of trial, he was sentenced to life in prison with the possibility of parole after fifteen years on the charge of murder in the second degree. At the sentencing hearing, although defense counsel acknowledged that the judge had no discretion in imposing a sentence for murder in the second degree, he asked for a continuance so that he could present evidence of mitigation. Defense counsel informed the judge that he had retained an expert in juvenile psychology and that he wanted to present the expert's testimony at sentencing. According to defense counsel, this testimony would have discussed "unique things about juveniles, their perception, their need for instant gratification, their likelihood of success and rehabilitation . . . all things that are important." The judge acknowledged the possible importance of this information when the defendant is eligible for parole, but

denied the defendant's request. The judge believed that the information was better suited to be presented to the parole board at the time of the parole hearing.

The defendant timely filed a notice of appeal, which was stayed so that he could pursue a motion for a new trial. In his motion, the defendant argued, among other things, that the statutorily mandated sentence of life with the possibility of parole after fifteen years violated provisions of the State and Federal Constitutions; certain instructions given on the homicide charge were erroneous; and counsel was ineffective in failing to object to improper instructions. After a nonevidentiary hearing, the motion was denied. The motion judge, who was also the trial judge, found that

> "[r]eview of the Okoro ruling makes clear that a person in [the defendant's] position is not under the law as presently enunciated in a position to argue that he must receive an individualized sentencing hearing after his conviction of second degree murder, an offense which requires the imposition of the mandatory sentence called for in [G. L. c. 265, § 2]."

The defendant's appeal from that denial was consolidated with his direct appeal, and we granted his application for direct appellate review.

Discussion. 1. Constitutionality of the defendant's sentence. The defendant argues that the statutory sentencing scheme for juveniles convicted of murder in the second degree, G. L. c. 127, § 133A, which mandates a sentence of life in

prison with the possibility of parole after fifteen years, violates the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights. He contends that the statutory scheme does not allow judges to exercise their discretion to impose anything less than a life sentence, with the possibility of parole, after an individualized hearing.[4] He argues that such a mandatory sentence for a conviction of murder in the second degree is disproportional in light of the decisions in Okoro, 471 Mass. 51; Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12 (2015) (Diatchenko II); Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655 (2013) (Diatchenko I); and Miller, 567 U.S. 460. The defendant asks us to consider whether to expand Miller's due process interpretation, post-Diatchenko I and post-Okoro, to require individualized sentencing hearings for juveniles facing statutorily imposed mandatory life sentences with parole eligibility. Further, relying on Miller, the defendant argues that the denial of his motion to continue the sentencing hearing prohibited him from presenting mitigating

---

[4] The defendant does not contend that parole eligibility after fifteen years is cruel and unusual or disproportional to the offense, but is instead "challenging the legislature's one size fits all determination that a life sentence is necessary for every juvenile convicted of second degree murder."

evidence concerning his "distinctive mental attributes and environmental vulnerabilities."

In Diatchenko I, we held that, in light of the United States Supreme Court's decision in Miller,[5] the Massachusetts statute imposing a sentence of mandatory life without parole, G. L. c. 265, § 2, violated the defendant's right of protection against cruel and unusual punishment and that the discretionary sentence of life without parole upon the defendant violated the State constitutional prohibition against cruel or unusual punishment. Diatchenko I, 466 Mass. at 667-671. We concluded that a juvenile homicide offender who is convicted of murder in the first degree and receives a mandatory sentence of life in prison must be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and that this opportunity must come through consideration for release on parole. Id. at 674, quoting Graham v. Florida, 560 U.S. 48, 75 (2011). As a key distinguishing factor to the case before us, however, the sentencing statute was invalid only with respect to language prescribing life without the possibility of parole for juvenile offenders. Diatchenko I, supra.

---

[5] In Miller v. Alabama, 567 U.S. 460, 465, 469-480 (2012), the United States Supreme Court held that mandatory sentences of life without parole for offenders under the age of eighteen at the time of their crimes violates the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution.

Two years after the decision in Diatchenko I, we expanded its holding in Okoro, supra. In Okoro, the defendant argued that the Eighth Amendment, as established in Miller, required individualized sentencing hearings in every case in which a juvenile homicide offender received a life sentence. Okoro, 471 Mass. at 56. While we agreed with the defendant in Okoro that certain language in Miller could be read to suggest that individualized sentencing was required when juvenile homicide offenders faced a sentence of life in prison, that holding was narrow and specifically tailored to the cases before the Supreme Court at that time. Id. at 56-57. We concluded that "a mandatory life sentence with parole eligibility after fifteen years for a juvenile homicide offender convicted of murder in the second degree does not offend the Eighth Amendment or art. 26." Id. at 62. We accepted this on the understanding that it is for the parole board to take into account the unique characteristics that make juvenile offenders constitutionally distinct from adults and ensure they are afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 58, quoting Diatchenko I, 466 Mass. at 674.

In Okoro, 471 Mass. at 58, we "[left] for later day the question whether juvenile homicide offenders require individualized sentencing" for several reasons. First, we held

that the narrow holding in Miller was particularly directed at juveniles who were sentenced to life without parole. Id. See Miller, 567 U.S. at 489. Second, the constitutional distinction between adults and juveniles for purposes of sentencing was of fairly recent origin. Okoro, supra at 59. The scientific and social scientific bases for this distinction were subject to continuing research, and we could not predict the ultimate results of that research. Id. at 59-60. The law relating to this distinction was continuing to change and develop. Id. at 60. Finally, we cited the constitutional differences between adults and juveniles in our sentencing laws. Id. at 61-62. The Legislature had determined that every defendant convicted of murder in the second degree must serve a life sentence with the possibility of parole, but adult offenders must wait twenty-five years before becoming eligible while juvenile offenders become eligible in fifteen years. See G. L. c. 279, § 24; G. L. c. 119, § 72B.

At that point, we thought it prudent to allow this area of the law to settle further before revisiting our interpretation of Miller. For the same reasons we stated in Okoro, we remain unwilling to revisit our interpretation in regard to individualized sentencing. The Commonwealth suggests that in the four years since Okoro, our case law has only affirmed that the opportunity to seek parole after fifteen years is an

appropriate and proportional minimum sentence for murder in the second degree. The defendant points to extrajurisdictional cases, dicta, and one scientific study to suggest that there have been significant changes in the relevant law and science since Okoro. We are unpersuaded that the law and science are firmly established to warrant further consideration at this time. In sum, we leave the question open and conclude, as we did in Okoro, that a mandatory life sentence with parole eligibility after fifteen years for a juvenile homicide offender convicted of murder in the second degree is constitutional. The motion judge did not abuse his discretion in concluding that the defendant is not entitled to individualized sentencing.

The defendant further contends that the judge violated his due process rights in denying his request for a continuance of sentencing so that he could present evidence of mitigation. He argues that evidence available to him at the time of sentencing -- at a minimum, evidence of his mental state and immaturity -- may not be available to him at the time of his first parole hearing. The judge acknowledged the possible importance of this evidence when the defendant is eligible for parole but denied the defendant's request. The judge believed that the information was better suited to be presented to the parole board at the time of the parole hearing.

In Diatchenko II, 471 Mass. at 24, 27, 32, we extended certain due process protections to juveniles sentenced to life appearing before a parole board.  See Okoro, 471 Mass. at 62-63 (due process protections of Diatchenko II apply to juveniles convicted of murder in second degree).  These protections included the right to appointment of counsel and the right to access funds to retain expert witnesses.

Here, we agree with the judge.  Although the defendant constitutionally is entitled to funds to establish mitigating evidence that will be relevant before the parole board, he or she is not entitled to make a record through an adversarial process before sentencing.  The defendant may, for example, immediately seek funds for an expert report explaining the relationship between a defendant's neurobiological immaturity and culpability.  However, the appropriate time to make a record of any expert evidence will be at the parole board hearing.[6]

2.  Jury instructions.  At trial, the defendant sought, but did not receive, jury instructions on accident, involuntary

---

[6] We determine that juvenile homicide offenders are allowed to seek funds to investigate immediately because of the closeness in time to the conduct that resulted in their incarceration.  We also recognize that there is no mechanism -- in rule or procedure -- that grants a juvenile homicide offender the opportunity to seek immediate funds.  Allowing the defendant to seek immediate funds is necessary to ensure that the juvenile homicide offender receives a meaningful opportunity for release. See Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 27-28 (2015). (Diatchenko II).

manslaughter, and voluntary manslaughter. He argues that two of these instructions, on involuntary manslaughter and voluntary manslaughter by reason of sudden combat, would have allowed the jury to consider a lesser charge than murder and that an instruction on accident would have given the jury the opportunity to acquit. We review the denial of a motion for a new trial for an abuse of discretion. See Commonwealth v. Acevedo, 446 Mass. 435, 441-442 (2006). We are cognizant that "[r]eversal for abuse of discretion is particularly rare where," as here, "the judge acting on the motion was also the trial judge." Id., quoting Commonwealth v. Lucien, 440 Mass. 658, 670 (2004).

a. Accident instruction. The judge declined to instruct the jury on the defense of accident. The defendant argues that the evidence at trial was sufficient to warrant such an instruction. The Commonwealth argues that the judge was correct in not providing the accident instruction because the evidence did not support one and it would have contradicted the defendant's theory at trial of self-defense or defense of another. We conclude that the evidence presented at trial did not warrant an accident instruction.

An accident instruction is warranted where "the evidence at trial fairly raised the possibility that [the defendant caused the victim's death] unintentionally while engaged in conduct

that was neither wanton nor reckless." Commonwealth v. Moore, 92 Mass. App. Ct. 40, 48 (2017), quoting Commonwealth v. Figueroa, 56 Mass. App. Ct. 641, 650 (2002). In cases in which the cause of death of a victim is by shooting, a defendant may be entitled to an accident instruction where such a defense is "fairly raised." Commonwealth v. Palmariello, 392 Mass. 126, 145 (1984). "Where there is no evidence of accident, the issue is not fairly raised and the judge need not give an accident instruction." Commonwealth v. Podkowka, 445 Mass. 692, 699 (2006). When analyzing whether a judge erred in declining to give an accident instruction, a reviewing court considers the evidence in the light most favorable to the defendant. Figueroa, supra at 651.

Here, viewed in the light most favorable to the defendant, there is no evidence that the victim's fatal injuries were caused by an accident. The evidence at trial showed that the defendant, along with his cohorts, planned to rob the victim of marijuana. The defendant armed himself with a revolver and told his confederates not to "worry" about the robbery because he had ready access to the weapon and that he "wouldn't be afraid to use it." Once the victim realized that the payment was short, the defendant effectuated the plan, "threw the car in reverse," and backed out of the victim's driveway with the victim still

leaning through the vehicle window. Before the victim could get out of the moving SUV, the defendant shot him in the chest.

Citing testimony from the Commonwealth's firearms expert, the defendant argues that evidence that the firearm used in the killing required a small amount of trigger pressure supported his request for an accident instruction because it would have been "very easy" for the gun to have discharged accidentally. This evidence does not warrant an accident instruction alone, and there was no additional evidence to support the contention that the firearm was discharged accidentally. In fact, the jury heard evidence that the defendant extended his arm with the gun across the passenger seat and shot the victim in the chest. The evidence showed that the defendant's intentional conduct caused the gun to fire, not mere "inadvertence, mistake, or negligence." See Figueroa, 56 Mass. App. Ct. at 650.

b. Involuntary and voluntary manslaughter instructions. The defendant argues that the judge erred in denying his request to instruct the jury on involuntary manslaughter. He further contends that trial counsel was ineffective in failing to object to the judge's decision not to give the instruction. We review for a substantial risk of a miscarriage of justice. See Commonwealth v. Randolph, 438 Mass. 290, 296 (2002) (equating ineffective assistance of counsel standard to substantial risk

standard in cases where waiver stems from omission by defense counsel).

We have "stated repeatedly that, 'when the evidence permits a finding of a lesser included offense, a judge must, upon request, instruct the jury on the possibility of conviction of the lesser crime.'" Commonwealth v. Gaouette, 66 Mass. App. Ct. 633, 639 (2006), quoting Commonwealth v. Woodward, 427 Mass. 659, 662-663 (1998). If a manslaughter charge is not supported by any view of the evidence, however, then a judge does not commit error by declining to give such an instruction. Commonwealth v. Nichypor, 419 Mass. 209, 216 (1994). "In deciding whether the evidence might have supported a manslaughter instruction, we draw all reasonable inferences in the defendant's favor." Commonwealth v. Bins, 465 Mass. 348, 368 (2013), quoting Commonwealth v. Masello, 428 Mass. 446, 449 (1998).

Involuntary manslaughter is an unintentional killing occurring while a defendant is engaged in wanton or reckless conduct that creates a high degree of likelihood that substantial harm will result to another. Commonwealth v. Power-Koch, 69 Mass. App. Ct. 735, 736-737 (2007). "[W]here a defendant is charged with murder, an instruction on involuntary manslaughter is appropriate if any 'reasonable view of the evidence would [permit] the jury to find "wanton [or] reckless"

conduct rather than actions from which a "plain and strong likelihood" of death would follow.'" Commonwealth v. Tavares, 471 Mass. 430, 438 (2015), quoting Commonwealth v. Braley, 449 Mass. 316, 331 (2007).

Here, an involuntary manslaughter instruction was not warranted. The evidence showed that the defendant armed himself with a firearm and planned to rob the victim. A reasonable view of the evidence suggests that the defendant exhibited conduct from which a plain and strong likelihood of death would result. The defendant pulled out a revolver and pointed it at the victim before shooting him in the chest. See Commonwealth v. Alebord, 68 Mass. App. Ct. 1, 7 (2006) ("The likelihood of death ensuing when a loaded weapon is aimed at a person or group of people and then intentionally discharged is plain and strong indeed").

The defendant also raises the same arguments regarding the judge's denial of his request for a voluntary manslaughter instruction. Specifically, he argues that the judge erred in not instructing the jury on reasonable provocation and sudden combat.[7]

Voluntary manslaughter is "a killing from a sudden transport of passion or heat of blood, upon a reasonable

---

[7] The judge instructed the jury on voluntary manslaughter and imperfect self-defense, but did not mention reasonable provocation or sudden combat.

provocation and without malice, or upon sudden combat." Commonwealth v. Walden, 380 Mass. 724, 727 (1980), quoting Commonwealth v. Soaris, 275 Mass. 291, 299 (1931). Not all physical confrontations, even those initiated by the victim, are sufficient. See, e.g., Commonwealth v. Curtis, 417 Mass. 619, 629 & n.6 (1994); Commonwealth v. Parker, 402 Mass. 333, 344-345 (1988), S.C., 412 Mass. 353 (1992) and 420 Mass. 242 (1995); Walden, supra at 727-728. Cf. Commonwealth v. Iacoviello, 90 Mass. App. Ct. 231, 242 (2016). Rather, "[t]here must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." Gaouette, 66 Mass. App. Ct. at 639-640, quoting Walden, supra at 728. The defendant's actions must be "both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." Commonwealth v. Groome, 435 Mass. 201, 220 (2001).

In cases where sudden combat is the claimed provocation, the victim generally must attack the defendant, or at least

strike a blow against the defendant in order to warrant a manslaughter instruction. See Curtis, 417 Mass. at 629. Here, there is no evidence that the victim struck the defendant, much less created a risk of serious harm. Nor is there evidence that the defendant objectively believed at the time of the shooting that the victim was armed with a firearm. The defendant relies on Moulton's testimony, in which Moulton stated that after the victim realized that the money in exchange for the marijuana was short he "tussled" with Moulton through the open passenger's side window. Moulton claimed that the victim had "a beer can or a bottle . . . in his hand" and was yelling "help." This evidence is insufficient to support a sudden combat instruction. See Commonwealth v. Bianchi, 435 Mass. 316, 329 (2001) (sudden combat instruction not warranted where defendant's illegal conduct "intentionally precipitated the confrontation" and defendant was armed with loaded weapon); Curtis, supra.

3. Motion to suppress cell phone location. Prior to trial, the defendant filed a motion to suppress the evidence of his cell site location information (CSLI) that police obtained from his cell phone carrier. The motion judge denied the motion, concluding that the emergency aid exception justified the warrantless pinging of Deshowitz's and the defendant's cell phones. In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings absent clear error 'but

conduct an independent review of [the] ultimate findings and conclusions of law.'" Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015), quoting Commonwealth v. Ramos, 470 Mass. 740, 742 (2015). The motion judge found the following. After the shooting, police learned that the victim was last seen alive with Deshowitz. Through records held by the registry of motor vehicles (registry), police determined that Deshowitz lived in Stoughton. A Stoughton police detective, Michael Tuitt, who was familiar with both Deshowitz and her sister, went to their residence where he learned that Deshowitz was not home, but her sister offered to call her cell phone. Tuitt recognized Deshowitz's voice on the call, but was concerned that she was speaking in a whisper and pausing before answering his questions. Tuitt said to Deshowitz that if she was not able to talk freely she should say "Tennessee." She responded, "Tennessee." He then said that if she could not speak because people were with her to say "seven." Deshowitz responded, "Seven." He then asked her if she could not get away to say "four." She responded, "Four." Finally, the detective told her that if she were not really in Abington (where she claimed to be with friends) to say "seven." She responded, "Seven." After his conversation with Deshowitz, Tuitt believed that she was in danger.

Tuitt returned to the police station, where he spoke with Sergeant Detective Melissa McCormack about obtaining the location of Deshowitz's cell phone. McCormack began the process of "pinging" Deshowitz's cell phone through her cell phone carrier. McCormack contacted a representative of the carrier and stated that there were exigent circumstances that necessitated the request for the cell phone's location based upon her certification of "imminent danger of death or serious physical injury."

In the interim, Tuitt received a telephone call from Deshowitz's mother, who told Tuitt that she believed something was wrong with her daughter. When police received Deshowitz's cell phone coordinates at 1:26 A.M., they discovered that the cell phone was located in Brockton. Tuitt asked Deshowitz's mother if Deshowitz knew anyone in Brockton. The mother replied that she knew a "Nate" and gave his address. The mother accompanied Tuitt to the address, where Tuitt observed a vehicle registered to the defendant's mother parked in the driveway. McCormack also learned from registry records that a licensed driver named "Nathan Lugo" resided at the residence.

As part of the exigency request, the cell phone carrier also provided police with the cell phone numbers and subscriber names for cell phones that either received or made calls to Deshowitz's cell phone. Among those numbers was a cell phone

subscribed to the defendant's mother. McCormack had that cell phone pinged via its carrier, which showed it to be in the same general location as Deshowitz's cell phone.

At approximately 3 A.M., police arrived at the defendant's residence and were allowed in by the defendant's mother. Police retrieved Deshowitz and asked her to speak with responding officers. Later that morning, the officers procured a search warrant. During their search, police discovered evidence linking the defendant to the killing, including the murder weapon. The officers proceeded to arrest the defendant, Deshowitz, Thames, and Moulton.

On appeal, the defendant argues that the motion judge erred in denying his motion to suppress the evidence obtained as a result of the pinging of Deshowitz's and his cell phones. He argues that the emergency aid exception to the warrant requirement does not apply because police had no objectively reasonable basis to believe that Deshowitz was injured or was in "imminent danger of physical harm" (citation omitted). Commonwealth v. Entwistle, 463 Mass. 205, 213 (2012), cert. denied, 568 U.S. 1129 (2013). The Commonwealth argues that the defendant lacked standing to contest the real-time "pinging" of Deshowitz's cell phone and that the motion judge's undisputed factual findings supported the application of the emergency exception to the search.

To prevail on a motion to suppress under art. 14 of the Massachusetts Declaration of Rights, a defendant must demonstrate that he or she has standing to contest the search and that he or she had an expectation of privacy in the area searched or in the item seized that society recognizes as reasonable.  See Commonwealth v. Figueroa, 468 Mass. 204, 216 (2014).  "A defendant has standing either if [he] has a possessory interest in the place searched or in the property seized or if [he] was present when the search occurred." Commonwealth v. Fulgiam, 477 Mass. 20, 35, cert. denied, 138 S. Ct. 330 (2017), quoting Commonwealth v. Williams, 453 Mass. 203, 208 (2009).

We conclude that the action by police of causing Deshowitz's and the defendant's cell phones to reveal their real-time location constituted a search in the constitutional sense.  See Commonwealth v. Almonor, 482 Mass.    ,    (2019) ("society reasonably expects that the police will not be able to secretly manipulate our personal cell phones for any purpose, let alone for the purpose of transmitting our personal location data").  Although the police's conduct was a search in the constitutional sense, our analysis does not end there.

a.  Deshowitz's cell phone.  We first look to determine if the defendant has standing to challenge the search of Deshowitz's cell phone.  We conclude that he does not.  See

Commonwealth v. Estabrook, 472 Mass. 852, 857 n.9 (2015) (defendants did not have standing to contest collection of CSLI associated with cell phones that they were not using). Cf. Commonwealth v. Augustine, 467 Mass. 230, 255 (2014), S.C., 470 Mass. 837 (2015) (person has reasonable expectation of privacy, to certain extent, in historical CSLI relating to cell phone). The defendant does not have automatic standing to contest the search of Deshowitz's cell phone because he does not have a possessory interest in it. See Commonwealth v. Cruzado, 480 Mass. 275, 282 (2018). Furthermore, the defendant does not have actual standing to contest the search of Deshowitz's cell phone. Police first pinged Deshowitz's cell phone at 1:26 A.M. Police entered the defendant's home to talk with Deshowitz at 3 A.M. Although the defendant was with Deshowitz when her location was searched, the period of the search -- less than two hours -- was not sufficiently significant to allow the defendant standing in Deshowitz's cell phone. Contrast Commonwealth v. Rousseau, 465 Mass. 372, 382 (2013) (police tracking codefendant's vehicle for thirty-one days gave defendant, who was often with codefendant, standing to contest search); Commonwealth v. Fredericq, 482 Mass.    ,    (2019) (defendant had automatic standing because police knew that he was in car with murder suspect whose movements were being tracked through CSLI of another cohort's cell phone for more than six days).

Likewise, at the time of the initial search of Deshowitz's cell phone, police did not know that she was with the defendant. Police only knew that she was the last person seen with the victim. It was not until the investigation unfolded that police discovered Deshowitz was at the defendant's house. The defendant cannot establish a reasonable expectation of privacy in Deshowitz's cell phone when it was tracked for a brief period of time and he was never a target of the tracking. Contrast Rousseau, 465 Mass. at 382 (CSLI search was specifically "targeted at [defendant's] movements").

In any event, the defendant's challenge of the search of Deshowitz's cell phone would be futile because the search was justified by the emergency aid exception. See Commonwealth v. Raspberry, 93 Mass. App. Ct. 633, 640-641 (2018) (emergency exception applied where police had objectively reasonable grounds to believe that emergency aid might be needed). Police were investigating a homicide and learned that the victim was last seen alive with Deshowitz. Tuitt spoke with her on her cell phone, but was concerned that she was speaking in a whisper and pausing before answering his questions. There were reasonable grounds to believe emergency aid might be needed especially after Deshowitz, in answering Tuitt's coded questions, indicated that she was not able to speak freely.

   b.  Defendant's cell phone.  The defendant has standing to challenge the search of his cell phone.  However, the information gathered from the pinging of the defendant's cell phone -- confirmation of the location of his residence -- already had been gathered by other means, the search of Deshowitz's cell phone.  Put another way, all of the evidence that led police to locate the defendant was obtained through the initial search of Deshowitz's cell phone.  Prior to pinging the defendant's cell phone, police had gathered the following information:  (1) Deshowitz's cell phone's coordinates were at an address located in Brockton; (2) Deshowitz's mother informed police that she knew her daughter frequently visited an address in Brockton with a person named "Nate"; (3) at the address in Brockton, police discovered a vehicle in the driveway registered to the defendant's mother; (4) registry records also indicated that a driver named "Nathan Lugo" resided at the residence; and (5) Deshowitz's cell phone carrier provided police with information that her cell phone had been in contact with a cell phone registered to the defendant's mother.  Only then did police ping the defendant's cell phone and discover that it was in the same location as Deshowitz's cell phone -- the defendant's address.  Therefore, even if the pinging of the defendant's cell phone was improper, in the circumstances, the police eventually would have found the defendant, and all the

evidence that tied him to the crime, at his residence when they conducted the search for Deshowitz.  See Commonwealth v. Hernandez, 473 Mass. 379, 386 (2015).  The use of the defendant's cell phone's global positioning system coordinates merely confirmed the evidence gleaned from Deshowitz's cell phone.  See United States v. Ellis, 270 F. Supp. 3d 1134, 1158 (N.D. Cal. 2017).  We do not need to analyze whether there was probable cause and exigency to ping the defendant's phone, because no evidence came from the search.

Conclusion.  We affirm the defendant's convictions and the order denying his motion for a new trial.

So ordered.